IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Acacia Media Technologies Corp., | NO. C 05-01114 |
| Plaintiff, | **FURTHER CLAIM CONSTRUCTION ORDER ; ORDER FINDING CLAIMS TERMS INDEFINITE AND CLAIMS INVALID** |
| vs. | |
| New Destiny Internet Group, et al., | |
| Defendants. | |
| And All Related and/or Consolidated Actions. | |

## I. BACKGROUND

In its July 12, 2004 Claim Construction Order, the Court reached a tentative conclusion that the term "sequence encoder" as used in claims 1, 7, 17, 18, 32 and 33 of the '702 patent is indefinite. This tentative conclusion of indefiniteness was based on the Court's findings from the intrinsic evidence that the term: (a) is never used in the written description; (b) does not appear in the drawings; (c) has no plain meaning, and (d) cannot be inferred to be a "time encoder," since a time encoder could be described in a dependent claim as a limitation of a sequence encoder.

In its July 12, Order, the Court also tentatively concluded that, based on the intrinsic evidence, the term "identification encoder," as used in claims 1, 5, 6, 17, 19, 27 and 31 of the '702 patent may be insolubly ambiguous because the term: (a) has no plain meaning; (b) is not defined in terms of what the apparatus is but rather how it functions; and (c) has no meaning to one of ordinary skill in the art, such that this person would understand the scope and bounds of the claim, when read in light of the specification. The Court, nevertheless, construed the claim term "identification encoder" in the '702 patent to mean "a structure that assigns a unique identification code."

The Court invited the parties to address the Court's concerns and specifically invited Plaintiff Acacia to present any extrinsic evidence on what a person of ordinary skill in the relevant art would understand the terms to mean when read in light of the patent specification.

While that invitation was outstanding, the case was placed under multi-district assignment. The Court invited all parties to submit briefs on any of the claim terms which the Court had construed. The Court reiterated its offer to Acacia to allow presentation of extrinsic evidence pertinent to the two terms tentatively found indefinite. The parties submitted briefs and declarations by proffered experts: Andrew B. Lippman and S. Merrill Weiss. On September 8 and 9, 2005, the Court conducted a hearing and the matter submitted for decision. This Order addresses the claim construction issues tendered to the Court.

## **II. STANDARDS**

Claim construction is purely a matter of law, to be decided exclusively by the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996). Claims are construed from the perspective of a person of ordinary skill in the art at the time of the invention. Markman v. Westview Instruments, Inc., 52 F.3d 967, 986 (Fed. Cir. 1995). To determine the meaning of the claim terms, the Court initially must look to intrinsic evidence, that is, the claims, the specification, and, if in evidence, the prosecution history. Autogiro v. United States, 384 F.2d 391 (Ct. Cl. 1967). The Court must look first to the words of the claims themselves. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). These words are to be given their ordinary and customary meaning unless it is clear from the specification and prosecution history that the inventor used the term with a different meaning. Id. The claims should be

interpreted consistently with the specification.  See Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Where intrinsic evidence alone resolves any ambiguity in a disputed claim term, it is improper to rely on evidence which is external to the patent and file history.  Vitronics, 90 F.3d at 1583, 1585.  However, extrinsic evidence may be considered in the rare instances where the intrinsic evidence is insufficient to enable the court to construe disputed claim terms.  Id. at 1585.  Common sources of extrinsic evidence include expert testimony, inventor testimony, dictionaries, and technical treatises and articles.  Id. at 1584.

### III.  DEFINITIONS CONFIRMED

The Court reaffirms its July 12, 2004, Order and lets stand its definitions of the following terms, with any modifications noted:

**1.     Transmission system**

The Court lets stand its previous definition of "transmission system" to mean an assembly of elements, hardware and software, that function together to convert items of information for storage in a computer compatible form and subsequent transmission to a reception system.

**2.     Transmission system at a first location**

The Court lets stand its previous definition of "transmission system at a first location" to mean a transmission system at one particular location separate from the location of the reception system.

**3.     Reception system at a second location**

The Court lets stand its previous definition of "reception system at a second location" to mean a reception system at one particular location separate from the location of the transmission system.

**4.     In data communication with**

The Court lets stand its previous definition of "in data communication with" to mean two or more devices connected such that data is being transferred between the devices in real time.  During the September hearing, questions arose as to the meaning of "in real time" after the previous order was issued.  The Court defines "in real time" to mean that the receiving system receives the data in the same electronic time frame as the transmission system sends the data.

### 5.     Remote locations

"Remote locations" was defined in the previous order as part of the '992 patent claim construction. The Court includes the construction for the '992 patent in the '702 patent claim construction with its justification outlined in the previous order. The term "remote locations" means positions or sites distant in space from some identified place or places.

### 6.     Transceiver

The Court lets stand its previous definition of "transceiver" to mean a singular device capable of both sending and receiving information.

## IV.  CLAIM TERMS TENTATIVELY FOUND INDEFINITE

The Court now addresses the terms which it tentatively concluded were indefinite.

**A.     The statutory requirement of definiteness.**

Every patent's specification must "conclude with one or more claims particularly point out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. This requirement is commonly referred to as the "definiteness" requirement.

As the United States Supreme Court explained in General Electric Company v. Wabash Appliance Corporation, 304 U.S. 364, 369 (1938):

> Patents, whether basic or for improvements must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not. The claims measure the invention. . . . In a limited field the variant must be clearly defined.

A patent claim which fails to meet the definiteness requirement is invalid. Id., See also United Carbon Company v. Binney Company, 317 U.S. 228, 232 (1942); Default Proof Credit Card System, Inc. v. Home Depot, 412 F.3d 1291, 1302-1303 (Fed. Cir. 2005).

4

**B.     The question whether a patent claim meets the definiteness requirement is a question of law for the Court.**

A determination as to whether a patent claim meets the definiteness requirement is a question of law to be decided by the court in performance of its duty as the construer of patent claims. <u>Bancorp Services, L.L.C. v. Hartford Life Insurance Co.</u>, 359 F.3d 1367, 1371 (Fed. Cir. 2004).

An issued patent is entitled to a statutory presumption of validity. 35 U.S.C. § 282. A patent claim is indefinite only if, under these canons of construction, the court finds that one skilled in the art would not understand what is claimed when the claim is read in light of the specification. <u>Personalized Media Communications, Inc. v. Int'l Trade Comm'n</u>, 161 F.3d 696, 705 (Fed. Cir. 1968). If the Court is able to determine a reasonable, unambiguous meaning of the terms of a claim, as those terms would be understood by a person of skill in the art in light of the specification, even though the task is formidable and the conclusion is one over which reasonable people disagree, the claim is not indefinite. <u>Bancorp Services, L.L.C.</u>, 359 F.3d at 1371; <u>see also</u> <u>Datamize, L.L.C. v. Plumtree Software, Inc.</u>, 417 F.3d 1342, 1347-1348 (Fed. Cir. 2005).

A determination of definiteness is made based upon proper interpretation of the meaning of the terms used in the claim, according to the canons of claim construction. <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d 1331, 1340-41 (Fed. Cir. 2003). Under those canons, interpreting the meaning of the terms begins with a review of the intrinsic evidence–the claims, other parts of the specification, and the prosecution history. <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996); <u>Datamize, L.L.C.</u>, 417 F.3d at 1348.

The claim terms are generally given their ordinary and customary meaning. If a technical term is used in a patent claim, generally, the term should be interpreted as having the meaning a person experienced in the field of the invention would give to it. <u>See</u> <u>Verve, L.L.C. v. Crane Cams Inc.</u>, 311 F.3d 1116, 1119 (Fed. Cir. 2002). Testimony by a witness, who is recognized by the Court as an expert in the field of the invention, about the common meaning of a technical term at the time the application was filed, is instructive in ascertaining its meaning. <u>See</u> <u>Glaxo Wellcome, Inc. v. Andrx Pharm., Inc.</u>, 344 F.3d 1226, 1229 (Fed. Cir. 2003); <u>Optical Discorp v. Del Mar Avionics</u>, 208 F.3d 1324, 1334 (Fed. Cir. 2000).

**C.     The Claims of the '702 Patent**.

Claim 1 of the '702 patent claims:

> 1. A communication system comprising:
> a transmission system at a first location in data communication with a reception system at a second location, wherein said transmission system comprises
>      **a sequence encoder**,
>      **an identification encoder**, and
>      a compressed data library in data communication with **said identification encoder**,
>           wherein **said identification encoder** gives items in said compressed data library a unique identification code; and
>      wherein said reception system comprises
>           a transceiver in data communication with said transmission system,
>           a storage device in data communication with said transceiver,
>           user playback controls in data communication with said storage device,
>           a digital compressor in data communication with said storage device, and
>           a playback device in data communication with said digital decompressor.

('702 patent, 19:26-47.)

**D.     "Sequence encoder."**

**1.     The term "sequence encoder" has no ordinary and customary meaning.**

In addition to Claim 1, the term "sequence encoder is also used in Claims 7, 17, 18, 32 and 33 of the '702 patent. In its tentative conclusion, the Court determined that the term "sequence encoder" had no ordinary and customary meaning in the field of the invention.

Initially, Acacia objected to that conclusion.[1] However, at the September 2005, hearing, Acacia tendered Mr. S. Merrill Weiss as an expert witness on how persons of ordinary skill would understand the terms used in the '702 patent claims and specification in 1991.

Mr. Weiss opined that the field of the invention disclosed in the '702 patent was "system design" in the broadcast television industry. (TR. 18:23-25, 19:1-1.) Mr. Weiss opined that he had a sufficient background to express an opinion on the education and experience of a person skilled in that field in 1991. In that regard, Mr. Weiss testified that one skilled in system design in the television broadcast industry was

---

[1] Acacia contended that an encoder is "a device or system that encodes data." Acacia asserted that a "sequence encoder" is "an encoder which creates a sequence."

United States District Court
For the Northern District of California

1 one who had a Bachelor of Science degree in electrical engineering, computer science or computer
2 engineering or the equivalent in experience in the broadcast television industry.  (TR. 43.)
3       Specifically, with respect to whether the term "sequence encoder" had an ordinary and customary
4 meaning to one skilled in system design in the television broadcast industry,  Mr. Weiss testified:

> Q.  In 1991, did the term "sequence encoder" have an ordinary
>     meaning to one of ordinary skill in the art?
>
> A.  No.
>     * * *
> Q.  In 1991, would the term "sequence encoder" have been a term of
>     art to one of ordinary skill in the art?
>
> A.  No.
>     * * *
> Q.  Are you aware of any dictionary in 1991 where it would have
>     defined the term "sequence encoder"?
>
> A.  No.

(TR. 64-65.)

       Accordingly, the Court confirms its tentative finding that the term "sequence encoder" is a technical term which had no ordinary and customary meaning in the field of the invention at the time the patent was filed.

### 2.     "Sequence encoder" is a coined technical term which is not expressly defined.

       A patentee is free to act as his or her own lexicographer.  Acting as lexicographer, the patentee may either define a term used in a claim differently from its ordinary meaning or coin a new term.  However, if the patentee chooses to act as his or her own lexicographer, the special definition must be clearly stated within the patent specification or file history.  <u>Vitronics Corp.</u>, 90 F.3d at 1582.

       Acacia now acknowledges that the term is a "coined term," meaning that the patentee made up the term acting as lexicographer.  However, there is no clear statement of definition of the coined term "sequence encoder" in the specification or file history.  Indeed, as the Court noted in its July 12 Order, other than in the claims themselves, the term "sequence encoder" is never used in the specification of the '702 patent and was never used or referred to in the prosecution of the '702 patent.

7

If a patentee uses a coined technical term as an element of a claim and fails to clearly define the term elsewhere in the specification or prosecution history, the meaning of the term is left to speculation and subjective judgment. A patent claim, which includes as an element a term, the meaning of which is left to speculation and subjective judgment, is indefinite.

To avoid an ultimate finding of indefiniteness, Acacia contends that, although the term is not expressly defined in the specification, a person skilled in the art would infer a meaning for the term "sequence encoder" from the description in the specification of other devices. Specifically, Acacia contends that one skilled in the art would infer that by "sequence encoder" the patentee meant "a time encoder."

### 3. A patent claim is not indefinite if based on the specification, a meaning for an otherwise undefined term can be inferred from the specification.

Acacia directs the Court to two decisions of the Federal Circuit which it asserts as authority for a methodology of defining coined claim terms that have no meaning in the art and are not referred to in the specification: Bancorp Services L.L.C. v. Hartford Life Insurance Co., 359 F.3d 1367 (Fed. Cir. 2004) and Network Commerce, Inc. v. Microsoft Corp., 422 F.3d 1353 (Fed. Cir. 2005).

In Bancorp a patent describes a system for administering and tracking the value of life insurance policies in separate accounts. Bancorp Services, 359 F.3d at 1369. The independent claims used the term "surrender value protected investment credits." Except for use in the claims themselves, the term was not used in the patent. The trial judge found the term to be unclear in meaning as to render the patent claims invalid. Bancorp argued that the challenged term meant the same as "stable value protected investment," a term which was commonly understood in the insurance field and which was used and defined in the specification. Id. at 1370. On appeal the Federal Circuit agreed with Bancorp that based on the specification the terms were equivalent to one another. Id. at 1373. Thus, Bancorp Services stands as authority that the failure to define a term is not fatal if the meaning of the term can be fairly inferred from terms in the specification which were commonly used in the field and which those of skill in the industry regarded as synonymous.

In Network Commerce the term "download component" was used in the claims. Network Commerce, 422 F.3d at 1357. It was found to be a term which had no commonly understood meaning nor

1  one with a specialized meaning in the field of the invention. However, the Federal Circuit gave a definition
2  to the term based on the specification. The claims stated how the "download component" functioned in the
3  claimed method. The Circuit Court relied on references to "download file" in the specification to define
4  "download component." Id. at 1360-1361.

5  This Court notes that Network Commerce is not a case where the claim was being reviewed to
6  determine if it met the "definiteness" requirement. The issue in Network Commerce was whether or not the
7  definition of the term should include a "boot program" which interacts with the operating system of the
8  computer. The Circuit held that it did:

> In summary, the specification makes clear that the download component
> must include a boot program, and that the boot program interacts directly
> with the operating system of the computer without the assistance of any
> other program. Accordingly, we construe "download component to
> mean...

Id.

Acacia is correct, however, that in both cases, the Federal Circuit gave definition to a coined term which was not expressly defined in the specification. However, in both cases, the Federal Circuit relied on the intrinsic language of the patent specification to construe the meaning of the subject terms. The question in this case becomes whether based on the specification of the '702 patent, it can be reasonable inferred that the term "sequence encoder" means "time encoder."

**4.     A "time encoder" is referred to in the specification.**

The term "time encoder" is itself a coined technical term with no ordinary and customary meaning to one skilled in the field of system design at the time the '702 patent was filed. Mr. Weiss, though, testified that in his opinion a "time encoder" was essentially a "time code generator," which was known at the time of the invention (TR. 173:23-25.)

The Court considered the device called "time encoder" when the Court defined the term "ordering means" in construing the '992 patent. The '702 patent shares the same specification as the '992 patent. With respect to "time encoder," the specification states:

> The transmission system 100 of the present invention also preferably
> includes ordering means for placing the formatted information into a
> sequence of addressable data blocks. As shown in FIG. 2a, the ordering

> means in the preferred embodiment includes time encoder 114.  After the retrieved information is converted and formatted by the converter 113, **the information may be time encoded by the time encoder 114.  Time encoder 114 places the blocks of converted formatted information from converter 113 into a group of addressable blocks.**  The preferred addressing scheme employs time encoding.  Time encoding allows realignment of the audio and video information in the compressed data formatting section 117 after separate audio and video compression processing by precompression processor 115 and compressor 116."

('702 patent, 7:50-64.)

From this and other references in the specification, the Court finds that the "ordering means" may include a " time encoder" which is a device that can be used in a preferred embodiment of the claimed "transmission system."  If a "time encoder" is used as part of the ordering means, its function is to place blocks of converted data into a "group of addressable data blocks."  The "time encoder" uses "time encoding" to do so.  There is nothing in the specification which discloses that the "time encoder" can encode any sequence other than "time."  Thus, to give "sequence encoder" the definition of the "time encoder disclosed in the specification" would limit the "sequence encoder" to encoding "time" as the only sequence it is capable of encoding.

### 5. There is no suggestion in the specification that "time" is the only "sequence" which could be used to practice the invention.

There is nothing in the specification of the '702 patent which supports the contention that the patentee intended time to be the only encodable sequence.

If a patentee uses a broad undefined term (such as "sequence encoder") in claiming an invention, when the validity of the patent is called into question in a legal proceeding, the owner of the patent cannot avoid invalidity by adopting a more limited definition (such as "time encoder"), unless that limitation can be fairly inferred from the specification.

Mr. Weiss opined that, since the patent is "fundamentally" about audio and video information and since such information is naturally processed and stored using time, a person of ordinary skill in the art would understand "sequence encoder" to be a "time encoder:"

//

| | | |
|---|---|---|
| 1 | Q. | Now, if as you said earlier without regard to any part of the patent the term "sequence" can mean any sequence and not necessarily a time sequence, why would a person of ordinary skill in the art understand the term "sequence encoder" to be a time encoder rather than some other encoder in the context of this patent? |
| 2 | | |
| 3 | | |
| 4 | A. | Because this patent is fundamentally about video and audio processing and storage and handling and the natural way that video and audio are, are – their inherent structure is along a time line. They are naturally divided by – into time. |
| 5 | | |

(TR. 161:2-13.)

However, on cross-examination, Mr. Weiss acknowledged that, based on the specification, time was not the only natural sequence for organizing the type of data covered by the invention:

| | | |
|---|---|---|
| | Q. | And so you agree that as of the time of the filing of the patent application in January of 1991 packets of data were organized and in sequences that were unrelated to time? |
| | A. | I think you last said they could be and yes they could be. |
| | Q. | And they actually were; correct? |
| | A. | In some applications they were. |

(TR. 210:9-16.)

Later, in his testimony, Mr. Weiss acknowledged that a "time encoder" was only "one example" of the broader term "sequence encoder."  (TR. 225:10-14.) He stated his opinion that the terms were synonymous was based on a process of elimination.  In other words, since a "time encoder" and an "identification encoder" were the only encoder mentioned in embodiments of the invention, by process of elimination, Mr. Weiss drew the conclusion that the "sequence encoder" meant the "time encoder."  Mr. Weiss' testimony went beyond the bounds of his expertise.  The Court rejects his methodology.

Furthermore, it is fundamental that while the specification should be consulted to obtain an understanding of a claim, the limitation of a preferred embodiment disclosed in the specification is not to be read into a claim, unless reading the limitation in is required by the language of the claim.  As the Federal Circuit observed in Phillips v. AWH Corp., "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." 415 F.3d 1303 at 1323 (Fed. Cir. 2005).  There are notable exceptions to the rule for not limiting the claim to a preferred embodiment, such as when the preferred embodiment is described in the

specification as the invention itself. In other words, where the patentee describes an embodiment as being the only way of utilizing the invention, it is permissible to limit the claim to the embodiment.

In this case, given the types of materials which can be transmitted in practicing the invention (books, photographs, musical instruments and other items–digitized for transmission) from the specification, there is no basis for the Court to conclude that "time" is the only sequence which one skilled in the art would have used in 1991 to practice the invention.

### 6. To import into "sequence encoder" the definition "time encoder" as disclosed in the specification would be importing a limitation which the patentee expressly did not import.

Accepting Acacia's definition of "sequence encoder" would violate the doctrine of claim construction, called "claim differentiation."[2]

In deciding the scope of a claim, the Court is obliged to consider the other claims in the patent. Howes v. Medial Components, Inc., 814 F2d 638, 643 (Fed. Cir. 1987); Moeller v. Ionetics, Inc., 794 F2d 653, 656 (Fed. Cir. 1986). Under the doctrine of "claim differentiation," the presence of limitations in narrow claims is evidence that these limitations are not to be read into a broader claim. The patentee is entitled both to a narrow claim particularly directed to a preferred embodiment described in the specification and to a broad claim which defines the invention without reference to those details. The presence of the narrow claim negates limiting the broad claim to the preferred embodiment. The presence of a specific limitation in one claim gives special significance to the absence of that specific limitation in another claim, in that it shows that when the limitation was intended it was expressed. Hoganas AB v. Dresser Indus., Inc., 9 F.3d 949, 950 (Fed. Cir. 1993) (quoting E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir.), cert. denied, 488 U.S. 986 (1988); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1122 (Fed. Cir. 1985).

//

---

[2] The Court has previously considered and rejected Acacia's argument that "sequence encoder" should be defined as the time encoder disclosed in the specification. The Court reconsiders its ruling in light of the briefs and testimony presented at the September hearing.

In this case, dependent claim 7 reads:

> A communication system as recited in Claim 1**, wherein said sequence encoder transforms digital data blocks into a group of addressable data blocks**.

The Court has construed the apparatus which transforms digital data blocks into a group of addressable data blocks to be the "time encoder," which is part of the ordering means. The same terms should be given the same meaning in all of the claims, unless it is clear from the specification that the terms have different meanings. <u>Fin Control SYS. Pty. v. AM, Inc.</u>, 265 F.3d 1311, 1318 (Fed. Cir. 2001). Based on their common function, the Court finds that "sequence encoder that transforms digital data blocks into a group of addressable data blocks" in claim 7 is the same device as the one described in the specification as part of the ordering means called the "time encoder," which transforms the data into a "group of addressable blocks," employing "time" as the preferred addressing scheme.

Claim 1 differs from claim 7 it that it does not limit the sequence encoder to one which transforms digital data blocks into a group of addressable data blocks nor is it limited to using time as the preferred addressing scheme. Therefore, claim 1 is broader than the sequence encoder disclosed in claim 7. The sequence encoder in claim 1 could possibly be the ordering means and the structure in claim 7 could possibly be the time encoder.[3] Hence, the Court cannot infer that the "sequence encoder" is a "time encoder" as that term is used in the patent specification.

The Court examined <u>Bancorp Services</u> and <u>Network Commerce</u> to see if those cases involved claim differentiation issues. In those decisions, the Federal Circuit did not address whether an unlimited

---

[3] The "sequence encoder" in claims 7 could be construed to read on the "ordering means" in the written description. This is consistent with the testimony of Mr. Weiss, where he said that other encoding schemes, besides time encoding, may be used in the system (TR. 212:20-24, 224-225.) These other encoding schemes would be necessitated by source library items that contained other than audio/video information, like books or violins. There may also be other functions associated with the ordering means. Mr. Weiss said that he would have known how to build a time encoder, since time encoding techniques were well known in 1991 (TR. 174.) However, it would not have been obvious how to build the "ordering means," since the written description does not fully specify all the functions nor does it teach any structure for the "ordering means" from which such functions could be deduced.

element in an independent claim should be given a definition which would import the sole limitation of a dependent claim. Therefore, those cases are not authority for construing the subject patent.[4]

However, upon reconsideration the Court limits its finding of indefiniteness to the independent claims 1, 17 and dependent claim 32. Dependent claims "shall be presumed valid even though dependent upon an invalid claim." 35 U.S.C. § 282. The Court leaves for later consideration upon motions by the parties whether or not the limitations in dependent claims 7, 18 and 33 provide additional information about "sequence encoder" to allow the Court to define it and to satisfy the definiteness requirement.

### 7. There is a lack of indication of a cooperative relationship between the "sequence encoder" and the other elements of the claim.

Patents claiming a system, are indefinite under §112 if the claim does not recite structural relationships of essential elements. See In re Collier, 397 F.2d 1003 (C.C.P.A. 1968). If the system is one for which the relationship of elements is conventional and commonly known, the Court can take notice of a relationship, even if one is not stated. However, when the element is not known in the field of invention, the claim must specify the relationship.

Claims 1 and 32 of the '702 patent disclose a communication system, comprising a transmission system and a reception system. The "sequence encoder" is disclosed as an element of the transmission system. Unlike other elements of claims 1 and 32,[5] the term "a sequence encoder" omits disclosure of a cooperative relationship with the other elements. There is no specification of its input or its output. This omission is particularly troublesome because as a coined term which is not defined, there is no way to determine a relationship.

---

[4]The Court also considered Masami Corp. v. Mallinckrodt, Inc., 18 Fed. Appx. 852 (Fed. Cir. 2001), where the court found "adaptive filter" and "adaptive signal processor" to mean an "adaptive noise canceler." The latter term was used interchangeably with the other terms during the prosecution of the patent and in dependent claims. No such interchangeable use is involved in this case.

[5]Claim 7 also lacks an express relationship between the "sequence encoder" and the other elements. The term "in data communication with" is lacking. However, if the "sequence encoder" in Claim 7 is equated with the "time encoder," the specification shows a relationship.

14

Thus, an additional basis for indefiniteness of claims 1 and 32 is the lack of a disclosed cooperative relationship between the "sequence encoder" and the other elements leaves a gap between essential structural connections.[6]

**E.    "Identification encoder."**

   **1.    The term "identification encoder" is a coined technical term which is ambiguous.**

The Court confirms its tentative finding that the term "identification encoder" had no ordinary and customary meaning to one skilled in the art at the time of the invention. Mr. Weiss, Acacia's expert witness on the meaning of the term, testified that "identification encoder" had no ordinary meaning to one skilled in the art. (TR. 64:18-21.)

Since the term has no plain meaning, the Court looks to the patent specification to see if the patentee defined the apparatus. Unlike the "sequence encoder," the written description contains references to "identification encoder." Among others, the written description contains the following references to unrelated preferred functions of the "identification encoder" occurring at various unspecified times in the transmission system:

1.   The identification encoder 112 gives a unique identification code to items stored in a compressed data library (6:34-35);

2.   Performs storage encoding (giving the item a unique identification code, optionally logging details about the item, called program notes, and assigning the item a popularity code) just prior to conversion of the item for transmission to reception system, at any item after starting the conversion process, or after storing the item in the compressed data library (6:34-42);

3.   Preferably assigns: a unique identification code, a file address, a popularity code and input program notes (6:43-48);

4.   Inputs digital signal to digital input receiver (6:62-64);

---

[6] As shown in claims 17 and 18, the patentee was capable of specifying a relationship between the "sequence encoder" and other claim elements if there are any.

15

1  5.   Inputs analog signal to analog-to-digital converter (7:6-8);

2  6.   Passes previously compressed items directly to the compressed data library (7:36-41);

3  7.   Allows entry of item notes and production credits (10:45-51);

4  8.   Maps item addresses to item names as an alternative method of accessing items (10:52-53);

6  9.   Operates a program which updates a master item database containing facts regarding items in the compressed data library system (10:56-59);

8  10.  Generates a unique address code which makes access to the requested data possible (10:43-44).

As the Court stated in its July 12 Order, although some of the functions of the "identification encoder" are set out, there is no description of a structure which performs those functions. Apparatus claims cover what a device is, not what a device does. See Hewlett Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1468 (Fed. Cir. 1990). Figure 2a contains a block diagram designated "112" and labeled "IDENTIFICATION ENCODING PROCESS." A label entitled "Encoding Process" is more indicative of a method claim than it is of an apparatus claim. Indeed, the '992 patent, which is based on the same specification as the '702 patent, contains a method claim 41 which discloses identification encoding not as an apparatus, but as a step in a method:

> 41. A method of transmitting information to remote locations, the transmission method comprising the steps, performed by a transmission system, of:
>  storing items having information in a source material library;
>  retrieving the information in the items from the source material library;
>  **assigning a unique identification code to the retrieved information**;
>  placing the retrieved information into a predetermined format as formatted data;
>  placing the formatted data into a sequence of addressable data blocks;
>  compressing the formatted and sequenced data blocks;
>  storing as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and
>  sending at least a portion of the file to one of the remote locations.

('992 24:54-25:5)

Notwithstanding the "process" label, based on the written description the Court finds that block "112" is a diagram of what the patentee meant by "identification encoder." However, the references to

16

block 112 in the specification do not assist the Court in defining what an "identification encoder" is. All that the specification does is to describe what the "identification encoder" preferably must do. The specification does not disclose a circuit, a computer operating a software algorithm, or other apparatus which performs the functions designated for the "identification encoder."

Under certain circumstances, it may be permissible to claim invention of an apparatus and include in the specification only a block diagram along with a description of some of its functions. However, this method of claiming an apparatus is only permissible if the device is a conventional one, such that a person of ordinary skill would readily understand what the device is. Claiming an apparatus using only a block diagram with functional description is indefinite when the patentee names the device using a coined term and the various functions could be performed by an indefinite variety of devices.

Acacia's expert witness, Mr. Weiss, testified:

> Q. Does the '702 patent identify any single structure for identification encoder?
> A. No, it does not.
> Q. Does the '702 patent require any single structure for identification encoder?
> A. Does it require? No, it does not.

(TR. 146:10-15.)

\* \* \*

> Q. Take a look at column 6, line 39 through 42. What else, if anything, would the hypothetical person of ordinary skill have understood about the identification encoder from reading that portion of the specification?
> A. . . .that the identification encoder could similarly be located at any of those places in the system.

(TR. 93:5-18.)

At one point, Mr. Weiss stated that the only non-optional function of the "identification encoder" was "assigning a unique identification code." His stated assessment was based on the wording of the patent description. On the basis of Mr. Weiss' opinion, Acacia contends that the only function to be included in the construction of "identification encoder" is assignment of a unique identification code. The Court, however, must also include functions which may be worded as optional, but which would render the invention inoperable were they not included. If the Court did not do so, the patent would have no utility. Indeed, at another point in his testimony, Mr. Weiss disagreed with the "only non-optional function" analysis, stating that one would have to list other functions of the "identification encoder." (TR. 291-293.)

17

The Court confirms its earlier conclusion that at the time of the invention, one of ordinary skill in the art would not understand the scope or bounds of the structure of the term "identification encoder" when that term is read in light of the specification, rendering the claim term "identification encoder" indefinite. In its July 12 Order, the Court defined the term by using its nonspecific function—encoding an identification—and defined it as an apparatus for performing that function. The Court now concludes that this functional definition is insufficient to comply with the requirement of definiteness. The Court finds "identification encoder" indefinite and on that basis finds claims 1, 17 and 27 invalid. As with the "sequence encoder," the Court leaves for later consideration the affect of this finding on dependent claims.

## V. CONCLUSION

The Court concludes that the claim term "sequence encoder" is indefinite and renders independent claims 1, 17 and dependent claim 32 of the '702 patent invalid. The Court reserves for later proceedings whether the invalidity of claims 1 and 17 affect the validity of each claim which depend from these claims. 35 U.S.C. § 282.

The Court concludes that the claim term "identification encoder" is indefinite and renders independent claims 1, 17 and 27 of the '702 patent invalid. The Court also reserves for later proceedings whether the invalidity of the independent claims affect the validity of claims which depend from them.

The Court invites any party desiring to file motions based on this Order to do so in accordance with the Local Rules of the Court. The Court also invites the parties to tender to the Court requests for construction of other terms. To accommodate potential motions and further claim construction proceedings, the Court specially sets a hearing on **February 24, 2006 at 9:00 a.m.** to hear any such motions. If no motions are filed, the parties are ordered to appear on that date at **10:00 a.m.** for a case management conference. In advance of the scheduled proceedings, the Court will advise the parties of the matters which it will consider and what pre-conference submissions are required.

Dated: December 7, 2005

_____
JAMES WARE
United States District Judge

18

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alan P. Block blocka@hbdlawyers.com
Alfredo A. Bismonte abismonte@mount.com
Annamarie A. Daley aadaley@rkmc.com
Bobby T. Shih bshih@mount.com
Bradford P. Lyerla blyerla@marshallip.com
Daniel Harlan Fingerman dfingerman@mount.com
Daralyn J. Durie djd@kvn.com
David A. York david.york@lw.com
David J. Silbert djs@kvn.com
David P. Pearson dpearson@winthrop.com
Emmett J. McMahon ejmcmahon@rkmc.com
Harold J. McElhinny HmcElhinny@mofo.com
J. Timothy Nardell EfilingJTN@cpdb.com
James Michael Slominski jslominski@hh.com
Jan J. Klohonatz jklohonatz@tcolaw.com
Jason A. Crotty jcrotty@mofo.com
Jeffrey D. Sullivan jeffrey.sullivan@bakerbotts.com
Jeffrey H. Dean jdean@marshallip.com
Jonathan E. Singer singer@fr.com
Juanita R. Brooks brooks@fr.com
Kevin D. Hogg khogg@marshallip.com
Kevin I. Shenkman shenkmank@hbdlawyers.com
Maria K. Nelson mknelson@jonesday.com
Marsha Ellen Mullin memullin@jonesday.com
Michael J. McNamara michael.mcnamara@bakerbotts.com
Mitchell D. Lukin mitch.lukin@bakerbotts.com
Morgan William Tovey mtovey@reedsmith.com
Patrick J. Whalen pwhalen@spencerfane.com
Paul A. Friedman pafriedman@mofo.com
Rachel Krevans rkrevans@mofo.com
Richard R. Patch rrp@cpdb.com
Robert F. Copple rcopple@lrlaw.com
Roderick G. Dorman dormanr@hbdlawyers.com
Sean David Garrison sgarrison@lrlaw.com
Stephen E. Taylor staylor@tcolaw.com
Stephen P. Safranski spsafranski@rkmc.com
Todd Glen Miller miller@fr.com
Todd R. Tucker ttucker@rennerotto.com
Victor de Gyarfas vdegyarfas@foley.com
Victor George Savikas vgsavikas@jonesday.com
William J. Robinson wrobinson@foley.com
William R. Overend woverend@reedsmith.com
William R. Woodford woodford@fr.com

Dated: December 7, 2005                    **Richard W. Wieking, Clerk**

                                                            **By:  /s/ JW Chambers**
                                                                 **Ronald L. Davis**
                                                                 **Courtroom Deputy**