1
2
3
4
5
6                       IN THE UNITED STATES DISTRICT COURT
7                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                               SAN JOSE DIVISION
9    Acacia Media Technologies Corp.,              NO. C 05-01114
10                    Plaintiff,                    **FOURTH CLAIM CONSTRUCTION
                                                    ORDER**
11          vs.
12   New Destiny Internet Group, et al.,
13                    Defendants.
14   _____
15   And All Related and/or Consolidated
     Actions.
16
     _____/
17
18                              **I.  BACKGROUND**
19          This is the Fourth Claim Construction Order in this Multi-District Litigation case in which
20   Plaintiff, Acacia Media Technologies Corporation, asserts infringement involving the Yurt's Family
21   of Patents entitled, "Audio and Video Transmission and Receiving System ('992, '275, '863, '720,
22   and '702).
23          On July 12, 2004, the Court issued its First Claim Construction Order.  (hereafter, the "July
24   12 Order," filed in SA CV 02-1040-JW (MLGx).)
25          On December 7, 2005, the Court issued its Second Claim Construction Order.  (hereafter, the
26   "December 7 Order," Docket Item No. 119.)
27          On December 14, 2006, the Court issued its Third Claim Construction Order.  (hereafter, the
28   "December 14 Order," Docket Item No. 216.)

United States District Court
For the Northern District of California

1    This Order gives the Court's construction of disputed terms in the '863 and '720 Patents

2    which were the subject of hearing in June and September, 2006.

3                                **II.  WITHDRAWN CLAIMS**

4    During the June and September hearings, the parties advised the Court that Acacia is

5    withdrawing from assertion Claims 1-13 of the '863 Patent and Claims 1-3, 5, and 9-10 of the '720

6    Patent.  The parties represented that a formal stipulation of withdrawal will be filed with the Court.

7    In view of the tendered withdrawal of those Claims, the Court will not give further consideration to

8    construing them, unless the Court finds it necessary to do so to construe a Claim which remains in

9    contention.

10                                  **III.  STANDARDS**

11   In addition to the authorities cited in this Order, the Court will apply the legal standards

12   recited in its previous Claim Construction Orders.

13                                  **IV.  DISCUSSION**

14   **I.    THE '863 PATENT**

15   **A.    The '863 Patent - Claim 14**

16   Claim 14 provides:[1]

17   A method of distributing audio/video information comprising:

18   transmitting compressed, digitized data representing a complete copy of at least one
     item of audio/video information at a non-real time rate from a **central processing**
19   **location**;

20   receiving the transmitted compressed, digitized data representing a complete copy of
     the at least one item of audio/video information, at a **local distribution system**
21   remote from the central processing location;

22   **storing the received compressed digitized data representing the complete copy of
     the at least one item at the local distribution system**;
23   **in response to the stored compressed, digitized data**, transmitting a representation
     of the at least one item at a real-time rate to at least one of a plurality of **subscriber**
24   **receiving stations coupled to the local distribution system**; and

25

26   _____

27        [1]  Unless otherwise indicated, all bold typeface is added by the Court to emphasize words
     and phrases under consideration.

28                                        2

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**decompressing the compressed, digitized data representing the at least one item of audio/video information after the transmission step wherein the decompressing step is performed in the local distribution system to produce the representation of the at least one item for transmission to the at least one subscriber station;**

**wherein the transmitting step comprises**:

**inputting an item having information into the transmission system**;
**assigning a unique identification code to the item having information**;
**formatting the item having information as a sequence of addressable data blocks**;
compressing the formatted and sequenced data blocks;
storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and
sending **at least a portion of the file** at the non-real time rate to the local distribution system.

**1.    The Sequence of Steps**

Before construing the words and phrases in Claim 14, the Court considers whether the steps of the claimed method must be performed in a particular sequence and if so, the required sequence.

Unless steps of a method claim actually recite a sequence, claims are not ordinarily construed to require a sequence.  Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1342 (Fed. Cir. 2001).  Interactive Gift recites a two-part test for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written.  Id. at 1343.  First, the court must look to the claim language to determine if, as a matter of logic or grammar, the steps must be performed in the order written.  If not, the court next looks to the rest of the specification to determine whether it "directly or implicitly requires such a narrow construction."  If not, the sequence in which the steps are written is not a requirement.  Id.  A sequence is required, for example, if a step references something logically indicating that a prior step had been performed.  In such a case, the prior step must be performed first.  Mantech Envtl.  Corp. v. Hudson Envtl.  Servs., Inc., 152 F.3d 1368, 1375-76 (Fed. Cir. 1998).

In the '863 Patent, **Steps (1)-(4)** of the method claimed in Claim 14 must be performed in the sequence in which they are written because each step references the previous step.  This sequence may be summarized as follows:

3

United States District Court

For the Northern District of California

**Step (1)**    transmitting compressed digitized data to a local distribution system ["first transmitting step"] and then;

**Step (2)**    receiving the transmitted compressed digitized data at the local distribution system ["receiving step"] and then;

**Step (3)**    storing the received compressed digitized data at the local distribution station ["storing step"] and then;

**Step (4)**    in response to the stored compressed, digitized data, transmitting a representation of the data from the local distribution station to a subscriber receiving station ["second transmitting step"].

In concluding that **Steps (1)-(4)** must be performed in the sequence in which they appear in the claim, the issue becomes when, in the sequence, does **Step (5)**, the "decompressing step," take place.

First, **Step (5)** requires "decompressing" the data "in the local distribution system," "after the transmission step." In order to meet those limitations, of necessity, decompression must take place after **Step (1)** (the "first transmitting step") has been executed. This is because it is only after **Step (1)** has been executed that the data is in "the local distribution system."

Second, **Step (5)** must be performed <u>before</u> **Step (4)** (the "second transmitting step") because after **Step (4)** the data is no longer in the local distribution system. In **Step (4)**, the data is transmitted to subscriber receiving stations and is no longer available for processing by the local distribution system.

Lastly, because **Step (5)** requires "decompression," it cannot be performed <u>before</u> **Step (2)** which requires receiving "compressed" data. Similarly, the decompression step cannot be performed <u>before</u> **Step (3)** because it requires storing "compressed" data. The decompression step cannot be performed <u>before</u> **Step (4)** because it is initiated in response to the stored "compressed" data. More importantly, as discussed above, the decompression step cannot be performed <u>after</u> **Step (4)** because in the execution of **Step (4)**, the data is transmitted out of the local distribution system and is no longer available in the local distribution system for decompressing.

4

United States District Court

For the Northern District of California

1    The Court finds that the ambiguity as to when in the sequence the "decompressing" step is to

2    be performed renders Claim 14 arguably indefinite.[2]

3    The Court invites the parties to address the issue of this arguable indefiniteness in motions

4    for an evidentiary hearing or for summary adjudication.  Notwithstanding the conclusion that Claim

5    14 is arguably indefinite, the Court considers other disputed words and phrases in Claim 14.

6    **2.    "central processing location"**

7    Claim 14 claims the following step:

8        transmitting compressed, digitized data representing a complete copy of at least one
         item of audio/video information at a non-real time rate from a **central processing
9        location**

10   The parties dispute the proper construction of the phrase "central processing location" as that

11   phrase is used in Claim 14 of the '863 patent.  The phrase "central processing location" is used in

12   the claim but it is not used elsewhere in the specification.

13   Courts may give a definition to a phrase which is only used in a claim if: a) the individual

14   words in the phrase have well-recognized meanings to those skilled in the relevant art; and b) the

15   court is able to discern a definition which the court, with reasonable confidence, finds would be

16   understood by one skilled in the art based on the language of the claim and the other intrinsic

17   evidence.  See Bancorp Services v. Hartford Life Insurance Co., 359 F.3d 1367, 1372 (Fed. Cir.

18   2004).

19   To determine what "central processing location" means to those skilled in the relevant art,

20   the Court turns to a standard dictionary prepared by the Institute of Electrical and Electronics

21   Engineers ("IEEE").  The IEEE defines "centralized computer network" as:  1) a computer network

22   configuration in which a central node provides computing power, control or other services; and 2) A

23

24   ───────────────

25   [2]  If the phrase had been, "before the transmission step," the Court would have conducted a
     different analysis because with that wording, the step arguably could be construed to refer to the

26   second transmission step.  However, the Federal Circuit has admonished against judicial rewriting of
     claims.  See Rhine v. Casio, Inc., 183 F.3d 1342, 1354 (citing Becton Dickinson & Co. v. C.R. Bard,

27   Inc., 922 F.2d 792, 799 & n. 6 (Fed. Cir. 1990)).

28                                              5

1   computer network in which a central node provides all network control functions and services to

2   other nodes.  <u>IEEE 100:  Authoritative Dictionary of IEEE Standard Terms</u>, 154 (7th ed. 2000).

3        Thus, it is reasonable to characterize that in the field of data communications, the phrase

4   "central processing" is generally understood by skilled artisans as a computer network configuration

5   in which a single system at the hub distributes data to multiple peripheral dependent systems

6   belonging to the network.  In contrast, a system in which "processing" is distributed over multiple

7   locations, would be understood by skilled artisans as a "decentralized system."  <u>Id</u>.  The term

8   "central" does not refer to any particular geographic location.  It refers to a functional location.

9        The step of Claim 14 under consideration discloses "transmitting" from a central processing

10  location.  Claim 14, contains specific limitations governing this transmitting step.  These limitations

11  are introduced using the transitional phrase "wherein the transmitting step comprises."  The

12  transmitting step is then prescribed as, among other limitations, inputting an item having information

13  into "the transmission system," followed by "sending" the information to the local distribution

14  system."  The Court finds that the phrase "**transmission system**" as used in Claim 14 is the

15  "**transmission system**" which the Court previously defined in its December 14 Order.  (December

16  14 Order at Section IA3.)  Accordingly, the "central processing location" is a limitation which

17  defines the functional location of the "transmission system."

18        The Court construes the phase **"central procession location"** as follows:

19        **a single transmission system, as previously defined, from which
          compressed, digitized data, representing a complete copy of the at least
20        one item of audio/video information, is transmitted at a non-real time
          rate to at least one of a multiple of local distribution systems.**

21

**3.    "data representing a complete copy of at least one item of . . .information"**

22

23        Claim 14 provides:

        transmitting compressed, digitized **data representing a complete copy of at least
24      one item** of audio/video **information** at a non-real time rate from a central
        processing location

25

26        The parties dispute the proper construction of the phrase "data representing a complete copy

27  of at least one item of information" as that phrase is used in Claim 14 of the '863 patent.  The Court

28                                                    6

**United States District Court**
For the Northern District of California

1   has already defined the phrases, "items containing information" and "information from items" in its

2   December 14 Order.  (See December 14 Order at Section IA7-8.)

3        In the '863 Patent, the written description, at times, equates "items of information" with

4   "items having information."  However, in the context of Claim 14, the Court construes **"items of . . .**

5   **information**" to mean "**information derived from items**."  With respect to the remaining words of

6   the phrase, the Court finds that skilled artisans, reading the patent claim and written description,

7   would give those words their ordinary and customary meanings.

8        The Court construes the phrase **"data representing a complete copy of at least one item of**

9   **information**" as follows:

10            **a complete copy of information from items.**

11  **4.    "local distribution system"**

12       Claim 14 claims the following steps:

13       receiving the transmitted compressed, digitized data representing a complete copy of
         the at least one item of audio/video information, at a **local distribution system**
14       remote from the central processing location

15       The parties dispute the proper construction of the phrase "local distribution system" as that

16  phrase is used in Claim 14 of the '863 patent.  The '863 Patent is the first patent in the Yurt Family

17  of Patents to use the phrase "local distribution system."

18       Under the principles of claim construction, there is presumed to be a difference in meaning

19  and scope when different words or phrases are used in separate claims.  Tandon Corp. v. U.S.

20  Intern. Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987).  In addition, "[T]he terms and

21  phrases used in the claims must find clear support or antecedent basis in the description so that the

22  meaning of the terms in the claims may be ascertainable by reference to the description.  Tandon

23  Corp. at 831 F.2d 1023, citing 37 C.F.R. 1.75(d)(1).

24       The '863 Patent shares the same written description with the other Yurt Patents.  The phrase

25  "local distribution system" is not used in the written description or prosecution history.  In Section

26  IA2, above, the Court construed "central processing location" to be the location of the transmission

27  system.  Under the written description and drawings, the transmission system transmits only to

28                                                     7

"reception systems." Therefore, the Court construes "**local distribution system**" to have the same

meaning as **"reception system**."

In Claim 14, the distribution system is limited to a "local" system. The Court construes this

limitation to have its commonly understood meaning to skilled artisans in this field, namely, a

geographic location in close proximity to the user or subscriber.[3]

The Court construes the phase "**local distribution system**" as follows:

> **a reception system, as previously defined,  located geographically close to subscriber receiving stations which are coupled to the reception system.**

**5.    "in response to the stored compressed, digitized data"**

Claim 14 provides:

> **in response to the stored compressed, digitized data**, transmitting a representation of the at least one item at a real-time rate to at least one of a plurality of subscriber receiving stations coupled to the local distribution system

The parties dispute the proper construction of the phrase transmitting "in response to the

stored compressed, digitized data" as that phrase is used in Claim 14 of the '863 patent.

The word "responsive" has a plain and ordinary meaning, namely, "answering." <u>See</u>

<u>Webster's New Twentieth Century Dictionary</u>, 1543 (2d ed. 1983).  In the field communications

field, a responsive action is one which replies to a transaction generated by a request. <u>IEEE 100:</u>

<u>The Authoritative Dictionary of IEEE Standards Terms</u>, 976 (7th ed. 2000).  Thus, the word

"responsive" is commonly understood to describe both a "cause-effect" relationship between two

events and a timing relationship between them.[4]

_____

[3] In the communications field, "local" is commonly understood as something in close proximity to a user's device.  For example, "local access and transport area (LATA):  (1) In the United States, a local geographic area in which a local telephone company is allowed to offer communications services;" "local area network (LAN);. . . (3) A communication network to interconnect a variety of intelligent devices (e.g., personal computers, workstations, printers, file storage devices) that can transmit data over a limited area, typically within a facility."  <u>IEEE 100:</u> <u>The Authoritative Dictionary of IEEE Standards Terms</u>, 633 (7th ed.  2000).

[4] In the "cause-effect" relationship, a second event is "responsive" to a first event if the first event causes the second event to happen.  In the "timing" relationship, the second event is "responsive" if the second event happens after the first event.  The Court finds that these two

United States District Court

For the Northern District of California

The Court finds that one of skill in the relevant art reading the patent documents would give the phrase "in response to the stored compressed data" in its plain and ordinary meaning. Accordingly, the transmitting step is caused by the storing of the compressed, digitized data and is commenced after the storing of the compressed, digitized data.[5]

With respect to the timing concept included in the definition of "in response to," the parties dispute whether the responsive "transmitting" step may take place while the information is being stored in the local distribution system, or must the "transmitting" step wait to commence after the storing step has been completed.  In the December 14 Order, the Court held that a step, which acts as an antecedent for a subsequent step, must commence before the succeeding step commences, and it must finish before the succeeding step can finish.  However, the succeeding step can start while the antecedent step is in process.  (See December 14 Order at Section IA2.)  The Court gives this same interpretation to Claim 14 and finds that the responsive transmitting step can start before the antecedent storing step has been completed.

The Court construes the phrase transmitting **"in response to the stored compressed, digitized data"** as follows:

> **transmitting a representation of the at least one item which is initiated by the commencement of storing compressed, digitized data or by the completion of storing compressed, digitized data.**

**6.    "subscriber receiving station," "subscriber station"**

Claim 14 provides:

> in response to the stored compressed, digitized data, transmitting a representation of the at least one item at a real-time rate to at least one of a plurality of **subscriber receiving stations coupled to the local distribution system**

> * * *

concepts are not mutually exclusive.

[5]  Although it is not explicitly stated as a step, because the information which is stored is the same information which is being transmitted (albeit at a real-time rate), a step of retrieving the information from the place where it is being stored is necessary before the information can be transmitted.

9

decompressing the compressed, digitized data representing at least one item of audio/video information <u>after</u> the transmission step wherein the decompressing step is performed in the local distribution system to produce the representation of the at least one item for transmission to at least one **subscriber station**

The parties dispute the proper construction of the phrases "subscriber receiving station" and "subscriber station" as those phrases are used in Claim 14 of the '863 patent.

Except for its use in some of the claims of the '863 Patent, neither the phrase "subscriber receiving stations" nor the phrase "subscriber station" appear elsewhere in the specification. In Section IA4 above, the Court defined "local distribution system" to mean "a reception system located geographically close to the subscribers of the system." The Court examines the specification to see if it provides a basis for inferring a definition of the phrases under consideration.

Claim 14 claims a method in which information is transmitted from a central processing location [transmission system] to a local distribution system [reception system], and from there to a "subscriber receiving station." There is no support in the written description or in the drawings for a reception system to communicate with another reception system. Therefore, the Court declines to construe "subscriber receiving stations" as a "reception system."

However, there is support in the written description for a reception system which outputs to a "receiving device." ('863 Patent, Col. 17:43-61). To avoid a construction which is not supported by the written description, the Court construes "subscriber receiving station" as a receiving device. Further, because "subscriber receiving stations" and "subscriber station" are used synonymously, the definition applies to both phrases.

The Court construes the terms "**subscriber receiving station**" and "**subscriber station**" as follows:

> **a receiving device at a subscriber's location.**

**7.   "wherein the transmitting step comprises"**

Claim 14 provides:

> **wherein the transmitting step comprises:**
> inputting an item having information into the transmission system;
> assigning a unique identification code to the item having information;

formatting the item having information as a sequence of addressable data blocks;
compressing the formatted and sequenced data blocks;
storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and
sending at least a portion of the file at the non-real time rate to the local distribution system.

The transitional phrase, "wherein the transmitting step comprises" means that the recited elements are <u>additional limitations</u> on the "transmitting step."  The Court refers to these as "additional limitations" so as to distinguish them from limitations which appear earlier in Claim 14.  Most of the disputed words and phrases in these additional limitations are identical to phrases previously defined by the Court with respect to other claims.  Accordingly, the Court adopts those definitions for the identical words and phrases.  However, there are two aspects of these additional limitations on the transmitting step which require consideration.

**8.   "inputting an item having information into the transmission system"**

The additional limitations of Claim 14 provide:

wherein the transmitting step comprises:
**inputting an item having information into the transmission system**;
assigning a unique identification code to the item having information;
formatting the item having information as a sequence of addressable data blocks;
compressing the formatted and sequenced data blocks;
storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and
sending **at least a portion of the file** at the non-real time rate to the local distribution system.

The first additional limitation of the transmitting step which the Court addresses include as an element, "inputting an item having information into the transmission system."  Up to this point, none of the other distribution methods of the Yurt family of patents have disclosed the act of "inputting" in an element.  The Court finds that one of ordinary skill in the art reading the patent documents would understand the phrase "inputting an item" in its plain ordinary sense, i.e., "putting the item in the transmission system."

Moreover, this particular additional limitation requires that the item which is being input be "an item having information."  In the December 14 Order, the Court construed the phrase "items

United States District Court
For the Northern District of California

containing information" as used in Claim 19 of the '992 Patent to mean physical items such as videotapes or computer disks, which contain audio/video information.  The Court construed the phrase "items having information" as used in Claim 41 of the '992 Patent to have the same meaning as "items containing information."  (See December 14 Order at Sections IA7 and ID4.)

The Federal Circuit has held if an identical term appears in claims issuing from both a parent and a continuation application, a consistent meaning is preferred.  Advanced Cardiovascular Sys., Inc. v.  Medtronic, Inc., 265 F.3d 1294, 1305 (Fed. Cir. 2001).  Accordingly, with respect to these additional limitations, the Court gives the phrase "**inputting an item having information into the transmission system**" a meaning consistent with its previous construction as follows:

> **In a distribution method in which compressed, digitized data is transmitted to a local distribution system, the phrase "inputting an item having information into the transmission system" means "putting physical items containing audio information or video information or both into the transmission system."**

The second aspect of the additional limitations on the transmission step which the Court addresses is that they require "sending **at least a portion** of **the file** at the non-real time rate to the local distribution system."  Elsewhere the method discloses "transmitting . . . at least **a complete copy** of at least **one item** of audio/video information."  Both of these limitations apply to the same transmission step.  The word "file" in one element refers to the same information as the word "item" in the other element.  The fact that one element requires that "a complete copy" of the item be sent, while the other element discloses a method for sending "at least a portion" of the information creates a conflict between the elements.  The Court finds that this conflict cannot be resolved by construing the latter element ("at least a portion") as controlling because the second step of the method requires "receiving . . . a complete copy."  Accordingly, the ambiguity over what is transmitted renders Claim 14 arguably indefinite.  The Court invites the parties to address the issue of this arguable indefiniteness in motions for an evidentiary hearing or for summary adjudication.

12

**B.      The '863 Patent - Claim 17**

Claim 17 provides:

A method of distributing audio/video information comprising:

formatting items of audio/video information as compressed digitized data at a central processing location;

transmitting compressed, digitized data representing a complete copy of at least one item of audio/video information from the central processing location;

receiving the transmitted compressed, digitized data representing a complete copy of at least one item of audio/video information, at a local distribution system;

storing the received compressed, digitized data representing the complete copy of at least one item at a local distribution system; and

**using the stored compressed, digitized data to transmit** a representation of at least one item to at a plurality of subscriber receiving stations coupled to the local distribution system;

wherein the formatting step comprises:

inputting an item having information into the transmission system;

assigning a unique identification code to the item having information;
formatting the item having information as a sequence of addressable data blocks; and

compressing the formatted and sequenced data blocks.

For Claim 17, the parties only dispute the proper construction of the phrase "using the stored compressed, digitized data to transmit a representation."

First, the Court applies its constructions of Claim 14 of the '863 Patent and Claim 19 of the '992 Patent to the corresponding terms of Claim 17.  Second, even though the phrase "**using the stored compressed, digitized data to transmit a representation**" is grammatically awkward, the Court construes it as follows:

> **The phrase  "using the stored compressed, digitized data to transmit a representation" means "transmitting a copy of the stored compressed digitized data.**

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

**II.     THE '720 PATENT**

**A.     The '720 Patent - Claim 4**

Claim 4 provides:

A digital audio/video communication network comprising:
a reception system **in data communication with** a plurality of **subscriber selectable receiving stations**, the reception system comprising,
     **means for receiving** compressed, digitized data representing at least one item of audio/video information at a non-real time rate,
     **means for storing** a complete copy of the received compressed, digitized data, and
     **means**, responsive to the stored compressed, digitized data, **for transmitting** a representation of the at least one item of audio/video information at a real-time rate to at least one of the plurality of subscriber selectable receiving stations, wherein said means for receiving, said means for storing, and said means for transmitting are positioned at the same location, and wherein the at least one of the plurality of subscriber selectable stations is located at a premises geographically separated from the location of the reception system.

**1.     "in data communication with"**

Claim 4 discloses a digital audio/video communication network comprising a reception system "in data communication" with a plurality of subscriber selectable receiving stations.  The parties dispute the proper construction of the phrase "in data communication with."

In the July 12 Order, the Court construed the identical phrase as it is used in Claim 1 of the '702 Patent.  The Court found that the phrase had a plain and ordinary meaning to those skilled in the relevant art and defined the phrase to mean "one or more devices connected such that data is being transferred between the devices in real time."   (See July 12 Order at Section IVC1c.)  Although the '702 Patent is no longer being asserted in this action, the Court adopts the same definition for the phrase as it is used in the '720 Patent.

The Court construes the phrase **"in data communication with"** as used in Claim 4 of the '720 Patent, as follows:

          **a reception system connected to subscriber selectable receiving stations such that data can be transferred between the devices in real time.**

**2.     "subscriber selectable receiver stations"**

The parties dispute the proper construction of the phrase "subscriber selectable receiver stations."  In Section IA6 above, the Court construed the phrases "subscriber receiving station" and

14

"subscriber station" as they appeared in Claim 14 of the '863 Patent as "a receiving device at a subscriber's location." The Court finds that the apparatus claimed in Claim 4 of the '720 Patent is the same apparatus, except that as an additional limitation, it must be "selectable," a non-technical term which has a plain and ordinary meaning.

The Court construes the phrase **"subscriber selectable receiver stations"** as follows:

**receiving device or devices which can be designated by the subscriber.**

**3.   "means for receiving compressed, digitized data representing at least one item of audio/video information at a non-real time rate"**

Claim 4 claims a reception system comprising three elements which are stated in mean-plus-function format. The parties dispute the proper construction of each of these three elements.

The first element of the reception system is "means for receiving compressed, digitized data representing at least one item of audio/video information at a non-real time rate." In construing the meaning of words and phrases used in a mean-plus-function element, the Court must first define the claimed function and any limitation which applies to that function. See Micro Chem., Inc.  v.  Great Plains Chem.  Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999). Typically, the words and phrases following the phrase "means for" indicate the function which is performed by the element. Lockheed Martin Corp.  v.  Space Systems/Loral, Inc., 249 F. 3d 1314, 1324 (Fed. Cir. 2001). If there is a dispute over the meaning of the words and phrases which express the function of the element, their meaning must be decided by the court, using the well-established principles of claim construction. Id.

Applying these principles to the "receiving means" element, the Court finds that the claimed function is "receiving compressed, digitized data representing at least one item of audio/video information at a non-real time rate." The Court finds that no further construction is necessary to further define the words and phrases used to state the claimed function.

After the function of the element is defined, the Court must look to the written description to identify corresponding structure which is linked to performing that function. See Micro Chem., Inc. v.  Great Plains Chem.  Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999). The element must be construed

"to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  <u>Chiuminatta Concrete Concepts, Inc.  v.  Cardinal Indus., Inc.</u>, 145 F.3d 1303, 1308 (Fed. Cir. 1998).

The Court examines the written description for corresponding structure and finds that it discloses a device which is linked to the function of receiving compressed, digitized audio/video information:

> The reception system 200 includes transceiver 201 which receives the audio and/or video information transmitted by transmitter 122 of the transmission system 100.  The transceiver 201 automatically receives the information from the transmitter 122 as compressed formatted data blocks.

('720 Patent, Col. 17:16-21.)

The Court construes **"means for receiving"** as follows:

> **In the reception system disclosed in Claim 4 of the '720 Patent, "means for receiving" is transceiver 201 shown in Figure 6 and its equivalents.**

**4.   "means for storing a complete copy of the received compressed, digitized data"**

The second element of the reception system disclosed in Claim 4 is "means for storing a complete copy of the received compressed, digitized data."  As described above, the Court first defines the claimed function of the "storing means" and then examines the written description for corresponding structure.

The function of the "storing means" is "storing a completed copy of compressed, digitized data."  With respect to corresponding structure, the written description discloses an embodiment of the reception system which includes a component called "storage 203."  The device is described as performing the function of storing an "item" until playback is requested:  "Storage 203 allows for temporary storage of the requested item until playback is requested."  ('720 Patent, Col. 17:31-32.)  In the described embodiment, the word "item" refers to compressed, digitized audio/video information received by the reception system.  ('720 Patent, Col, 17:19-39).  In addition, Figure 6 of the drawings, "storage 203" is drawn in the shape of a cylinder.  The Court finds that this is a flow chart symbol which represents an electromechanical assembly of data storage media.

The Court construes **"means for storing"** as follows:

> In the reception system disclosed in Claim 4 of the '720 Patent, "means for storing" means storing device 203 shown in Figure 6 and its equivalents.

**5.   "means, responsive to the stored compressed, digitized data, for transmitting a representation of the at least one item of audio/video information at a real-time rate to at least one of the plurality of subscriber selectable receiving stations"**

The third element of the reception system disclosed in Claim 4 is "means, responsive to he stored compressed, digitized data, for transmitting a representation of the at least one item of audio/video information at a real-time rate to at least one of the plurality of subscriber selectable receiving stations." This "transmitting means" element is expressed in means-plus-function format. Accordingly, the Court must decide the function of the "transmitting means" and identify any corresponding structure.

The function of the third element of the reception system is "transmitting a representation of an item of audio/video information at a real-time rate to one of at least a plurality of subscriber selectable receiving stations."

With respect to the "transmitting means" of Claim 4, the transmitting function must be "responsive to the stored compressed, digitized data." The parties dispute the proper construction of this phrase.

If a means-plus-function claim element contains a limitation on how the disclosed function is performed, the corresponding structure must be capable of performing the function with that additional limitation. Therefore, if there is a dispute over the words and phrases used in disclosing an additional limitation, the Court must construe the meaning of the words and phrases used in the additional limitation before examining the written description for corresponding structure.

In construing a limitation on the function of a means-plus-function element, the principles of claim construction apply. Courts must give the words of the element their ordinary and customary meaning as they would be understood by a person of ordinary skill in the relevant field. In construing the meaning of a limitation on the function of a means-plus-function claim, it is improper to narrow the scope of the function beyond the claim language. It is equally improper to broaden the

17

1    scope of the claimed function by ignoring clear limitations in the claim language.  <u>Lockheed Martin</u>

2    <u>Corp.</u>, 249 F.3d at 1324; <u>See</u> <u>also</u> <u>Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.</u>, 296 F.3d 1106,

3    1113 (Fed. Cir. 2002).  Courts may not import into the definition of the limitation the features of an

4    embodiment.  <u>JVW Enterprises, Inc. v. Interact Accessories, Inc.</u>, 424 F.3d 1324, 1331 (Fed. Cir.

5    2005).  Any limitation must come from the claim itself, independent of any embodiment.  <u>Id.</u>

6         The Court has previously defined the phrase "responsive to" in a method claim in a patent

7    which shares the same specification as the '720 Patent.  (<u>See</u> *supra* at Section IA5.)  The Court

8    construed the phrase to mean that a step to which a later step is "responsive" must be initiated by the

9    commencement of the antecedent step.  This same requirement applies to the use of the phrase

10   "responsive to" in an apparatus claim.  With respect to Claim 4, a structure which transmits "at least

11   one item of audio/video information" "responsive to stored, digitized data" initiates transmission

12   after recognizing that the storing of compressed digitized data has commenced or has been

13   completed.    In addition, since the transmission is of the information which is being stored, the

14   structure must somehow retrieve the information to be transmitted.  The Court now proceeds to

15   examine the written description for corresponding structure.

16        The written description describes and Figure 6 of the drawings depicts an embodiment of the

17   invention with a group of components which those of skill in the art would link to the functions of

18   receiving audio/video data from storage device 203 and transmitting the data in "real time:"

19       When playback is requested, the compressed formatted data blocks are sent
         [from storage 203][6] to data formatter 204.  Data formatter 204 processes the
20       compressed formatted data blocks and distinguishes audio information from
         video information.
21
         The separated audio and video information are respectively decompressed by
22       audio decompressor 209 and video decompressor 208.  The decompressed
         video data is then sent simultaneously to converter 206 including digital video
23       output converter 211 and analog video output converter 213.  The
         decompressed audio data is sent simultaneously to digital audio output

24

25

26   _____

27        [6]  The bracketed language is based on the previous paragraph in the written description that
     the "compressed formatted data blocks are stored in storage 203."  ('720 Patent, Col. 17:29-32.

28                                              18

converter 212 and analog audio output converter 214.  The outputs from converters 211-214 are produced in real time.

('720 Patent, Col. 17:39-52.)

Accordingly, in defining corresponding structure for the "transmitting means," the Court's attention is drawn to components 204-206, 208-209 and 211-214.  However, not only must the written description link a structure to the recited function, the description of the component must be adequate to allow one skilled in the art to understand what the component is and that it would be capable of performing the function.  35 U.S.C. 112 ¶ 2; Atmel v. Information Storage Devices, Inc., 198 F.3d 1374 (Fed. Cir. 1999).

With respect to the "transmitting means," several aspects of components described in the written description make them arguably inadequate to serve as corresponding structure.  First, nothing in the written description discloses which of these component, if any, initiates transmission in response to the commencement of storing of compressed, digitized data.  Second, although the written description discloses sending data from decompressors 208 and 209 to "converter 206," Figure 6 does not show a connection between these three components.  Finally, although the written description contains names for components 204 ("Data Formatting"), 206 ("Output Format Conversion"), 208 ("Video Decompression"), 209 ("Audio Decompression"), and 211-214 ("Converters"), there is no description of whether these components are hardware, software or both. The Court invites the parties to address whether an evidentiary hearing on these issues would be beneficial.  Pending the parties' response to this request, the Court defers defining the corresponding structure of the "transmitting means" of Claim 4.

**B.    The '720 Patent - Claim 6**

Claim 6 provides:

A digital audio/video communication network as recited in claim 4, further comprising a **processing station** for formatting items of audio/video information as compressed, digitized data and transmitting the compressed, digitized data representing at least one item of audio/video information at the non-real time rate to the means for receiving.

19

**United States District Court**
For the Northern District of California

1  **1.    "processing station"**

2      The parties dispute the proper construction of the phrase "process station" as used in Claim 6

3  of the '720 Patent.

4      Claim 6 is a dependent claim to Claim 4.  The introductory language of Claim 6 uses the

5  phrase "further comprising," which means that the elements of Claim 6 are in addition to those

6  recited in Claim 4.  The phrase "process station" is used in the claim but it is not used in the written

7  description.  Therefore, the Court must determine whether a skilled artisan reading the patent

8  document would understand the meaning of the phrase even if it is not used elsewhere in the

9  specification.  See Bancorp Services, 359 F.3d at 1372.

10     In Section IA2 above, using the principles of claim construction discussed in the Bancorp

11  Services, the Court construed the phrase "central procession location" to be "a single transmission

12  system, as previously defined, from which compressed, digitized data, representing a complete copy

13  of at least one item of audio/video information, is transmitted at a non-real time rate to at least one

14  of a multiple of local distribution systems."  The Court finds that the phrase "processing station" is

15  synonymous to a "transmission system."

16     The Court construes the phrase "**process station**" as follows:

17          **the transmission system as previously defined by the Court.**

18  **C.    The '720 Patent - Claim 7**

19     Claim 7 provides:

20     A digital audio/video communication network as recited in claim 6, wherein the processing
    station comprises:

21          **means for inputting** items of audio/video information;

22          **conversion means** for placing each input item of audio/video information into a
23          predetermined format as formatted data;

24          **compression means** for compressing the formatted data; and

25          **transmitter means** for sending compressed formatted data for the at least one item of
26          audio/video information at the non-real time rate to the reception system.

27

28                                          20

1    Claim 7 depends from Claim 6.  The elements of Claim 7 are limitations which apply to the

2    "processing station" claimed in Claim 6.

3    **1.    "means for inputting items of audio/video information"**

4    The first element of the "processing station" in Claim 7 is a "means for inputting items of

5    audio/video information." As discussed above, since the claim is in a means-plus-function format,

6    the Court must first identify the claimed function and then look to the written description to identify

7    corresponding structure which is linked to performing that function.  See  Micro Chem., Inc.  v.

8    Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999).

9    With respect to identifying a function, the phrase "inputting items of audio/video

10   information" describes a commonly understood function, i.e., "inputting."  To those skilled in the

11   relevant art, the function of  "inputting" means the act of  "putting or taking something into a

12   structure or process."

13   In addition to claiming "inputting" as a function, Claim 7 specifies an additional limitation

14   on that function, namely, what in particular is being inputted.  Claim 7 discloses inputting "items of

15   audio/video information.  There is a dispute over the meaning of the phrase "items of audio/video

16   information."

17   Based on the nature of the inventions disclosed in the '720 Patent, there are two possible

18   definitions of the phrase "items of audio/video information:"  (a) the phrase could be referring to

19   inputting physical items which contain audio/video information (e.g., audio tape), or (b) the phrase

20   could be referring to inputting the audio/video information retrieved from the physical items.  The

21   Court considers each of these separately.

22   **a.  Defining inputting "items of audio/video information" as inputting physical items containing audio/video information.**

23   In the December 14 Order, the Court construed a similarly worded phrase used in another

24   patent in the Yurt Family, namely, "items containing information."  The Court defined the phrase as

25   physical items, such as videotapes or computer disks, which contain audio/video information.  (See

26   December 14 Order at Section IA7.)  In this Order, *supra* Section IA7, the Court defines another

27

28                                                            21

United States District Court

For the Northern District of California

1    similarly worded phrase, i.e., "item having information," as physical items containing audio/video

2    information.

3           The language under consideration, "items of audio/video information" could mean physical

4    items which contain audio/video information or it could be referring to audio/video information

5    which has been retrieved from the physical items.  It is necessary for the Court to decide between

6    these competing definitions because the definition affects what structure may correspond to the

7    inputting function.

8           The written description provides:

9           Transmission system 100 of a preferred embodiment of the present invention
            preferably includes source material library means for temporary storage of **items**
10          prior to conversion and storage in a compressed data library means.  The **items of**
            **information** may include **analog and digital audio and video information** as well
11          as physical objects such as books and records which require conversion to a
            compatible media type before converting, compressing and storing their audio and
12          video data in the compressed data library means.

13          As shown in FIG 2a, the source material library means included in transmission
            system 100 preferably includes a source material library 111.  The source material
14          library 111 may include different types of materials including television programs,
            movies, audio recordings, still pictures, files, books, computer tapes, computer disks,
15          documents of various sorts musical instruments, and other physical objects.  These
            materials are converted to or recorded on a media format compatible to the **digital**
16          **and analog inputs** of the system prior to being compressed and stored in a
            compressed data library 118.  The different media formats preferably include digital
17          or analog audio and video tapes, laser disks, film images, optical disks, magnetic
            disks, computer tapes, disks and cartridges.

18   ('720 Patent, Col. 5:59-67- 6:1-14.)

19          This part of the written description discloses a "source material library," which temporarily

20   stores "items," also called "items of information."[7]  The "items of information" are "audio and

21   video" information which is either already in a "media format" which can be processed by the

22   system (e.g., digital or analog audio and video tape) or which is in a media format which require

23   conversion to a "compatible" media type which can be processed by the system.  Thus, a person

24   skilled in the art would understand "items of information" as used in the above embodiment to be

25

26   ───────────────

27          [7]  The Court finds that the reference to "temporary storage of **items** prior to conversion" and
     the phrase "**items of information"** in the next sentence refer to the same thing.

28                                                 22

physical items, namely physical media which contains audio/video information. If the Court assumes for purposes of its analysis that the "items of audio/video information" being input by the inputting means are the items being placed in the source material library, then the phrase should be defined as physical media containing audio/video information. Before examining the written description for corresponding structure of inputting physical media into the source material library, the Court examines another limitation of Claim 7.

The element of Claim 7 which follows the "inputting means" is called a "conversion means." The function of the conversion means is to place "each input item of audio/video information" into a predetermined format as formatted data. The requirement of Claim 7 that the "conversion means" act on "each input item" means that the inputting means is antecedent to the conversion means. The definition of corresponding structure must recognizes the relationship of the inputting structure to the conversion structure. In other words, if we assume that items of audio/video information are physical media being input into the source material library, the Court must identify a structure which is consistent with each of those same physical items being outputted to the conversion structure.

With respect to structural apparatus, although the written description discloses a "source material library" which stores physical items containing audio/video information, the written description is devoid of any discussion of an apparatus or process for "inputting" those items into the source material library. The written description contains neither a discussion of the source material library performing the function of inputting physical items nor is there any discussion of an apparatus linked to the source material library which inputs items into it. Every reference in the written description to the source material library states that it "includes" audio/video materials. There is never a discussion of a structure to place media into the source material library.

The absence of any discussion in the written description of a structure to input items into the source material library is consistent with the drawings. The drawings depict multiple structures for processing audio/video information. However, there is no drawing of a structure which inputs physical media into the source material library. Therefore, the Court declines to identify the source

United States District Court

For the Northern District of California

material library as corresponding structure to the inputting means.  If the Court is not able to identify any other structure linked to the inputting function, Claim 7 would be arguably indefinite.

The inputting means element is not defective simply because the source material library cannot be linked to the claimed function.  The claim is valid as long as there is any structure which is linked to and performs the claimed function.  <u>Cardiac Pacemakers, Inc.</u>, 296 F.3d at 1113.  The Court proceeds to examine the written description for any other corresponding structure.  As discussed above, in order to qualify as corresponding, the structure must be clearly linked to performing the function of inputting physical media and must also satisfy the requirement that it act on the physical media before the media is acted upon by the structure which performs the conversion function.

The written description contains the follow discussion of an embodiment which includes a "digital telecine device" which processes physical media before it is converted:

> If, for example, the retrieved information to be converted from the source material library 111 is a motion picture film, the picture frames in the film are passed through a **digital telecine device to the digital input receiver 124.**  Format conversion is the preferably performed by digital video formatter 125b.  Accompanying audio information is passed through an optical or magnetic digital playback device.  This device is connected to digital audio formatter 125a.

('720 Patent, Col. 7:23-30.)

This passage from the written description does not link the digital telecine device to performing all of the functions of the inputting means.  In order to qualify as corresponding structure, the written description must link the digital telecine device to "putting or taking something [physical media containing audio/video information] into a structure or process."  The above passage of the written description states that the physical media is "passed through" the digital telecine device. There is no discussion that the telecine device performs the function of inputting the physical media into itself or any other device or process.  The Court has not been able to identify any structure which is linked to performing the inputting function for physical media containing audio/video information.  Before concluding that Claim 7 is arguably indefinite, the Court examines

United States District Court

For the Northern District of California

an alternative definition of the claimed function and if supported by the patent documents, looks for corresponding structure.

**b. Defining inputting "items of audio/video information" as inputting audio/video information retrieved from physical media.**

Up to this point, the Court has been analyzing the construction of "inputting means" under an assumption that "items of audio/video information" should be defined as physical items containing audio/video information. Recognizing that an alternative definition of "items" is possible, the Court now proceeds to consider that alternative definition.

As indicated above, the phrase "items of audio/video information" is broad enough that one skilled in the art could regard it as referring to audio/video information which has been <u>retrieved from</u> the physical media on which it had been stored in the source material library or elsewhere in the system if that definition is supported by the patent documents. A different definition of the function would affect the identification of corresponding structure.

In the December 14 Order, the Court construed the phrase "information from items" as audio/video information retrieved from the physical items. (<u>See</u> December 14 Order at Section IA8.) Therefore, the issue is whether "items of" information should be defined as synonymous with "information from items." The Court examines the written description to see if this alternative definition of the function is support by it.

The phrase "items of information" appears in the same portion of the written description previously considered by the Court:

> Transmission system 100 of a preferred embodiment of the present invention preferably includes source material library means for temporary storage of **items** prior to conversion and storage in a compressed data library means. The **items of information** may include **analog and digital audio and video information** as well as physical objects such as books and records which require conversion to a compatible media type before converting, compressing and storing their audio and video data in the compressed data library means.

> As shown in FIG 2a, the source material library means included in transmission system 100 preferably includes a source material library 111. The source material library 111 may include different types of materials including television programs, movies, audio recordings, still pictures, files, books, computer tapes, computer disks, documents of various sorts musical instruments, and other physical objects. These

United States District Court

For the Northern District of California

1    materials are converted to[8] or recorded on a media format compatible to the **digital
2    and analog inputs** of the system prior to being compressed and stored in a
     compressed data library 118.  The different media formats preferably include digital
3    or analog audio and video tapes, laser disks, film images, optical disks, magnetic
     disks, computer tapes, disks and cartridges.

4    ('720 Patent, Col. 5:59-67- 6:1-14.)

5          Conceivably, the conjunctive phrase:  "audio and video information **as well as** physical
6    objects such as books and records" could be construed to mean that the system is handling audio and
7    video information, which <u>are not physical objects</u>, as well as books and records, which <u>are physical
8    objects</u>.  This alternative interpretation would mean the inputting means would have to input
9    audio/video information which has already been retrieved from the physical media.  For sake of
10   completeness, the Court will assume this alternative definition and examine the written description
11   for corresponding structure.[9]  As previously stated, a corresponding structure must be one which
12   recognizes that the information must next undergo the conversion function.  Thus it must operate on
13   pre-converted information.

14         The written description attributes the function of inputting pre-converted audio/video
15   information which has been retrieved from physical media to the identification encoder:

16         Prior to being made accessible to a user of the transmission and receiving system of
           the present invention, the **item** must be stored in at least one compressed data library
17         118, and given a unique identification code by identification encoder 112.

18   _____

19         [8]  Although the written description discusses "conversion" in terms of making books or
     pictures compatible for inputting to the system, the Court finds that this conversion does not deprive
20   the material of being in a pre-conversion state.  The function of the conversion means in the second
     element of Claim 7 is <u>not</u> converting the information in books or photographs into a system
21   compatible form.

22         [9]  This analysis is for sake of completeness only and is not being adopted by the Court.  If the
     patentee had used the conjunctive phrase "audio and video information <u>as well as other</u> physical
23   object such as books and records" this would lead to a conclusion that audio and video information
     meant physical media.  The phrase "as well as physical objects" leaves open the possibility that the
24   series contains two kinds of materials: audio/video information and physical objects.  This latter
     construction would mean that audio/video information was not a physical object. However, adopting
25   this latter construction is questionable because a full reading of the passage shows that the "items of
     information" are described as including "audio and video" information which is already in a "media
26   format" which can be processed by the system.  "Media" are physical items containing information.
     In addition, the examples given of compatible media, namely, digital or analog audio and video tape,
27   are examples of physical media.

28                                        26

United States District Court

For the Northern District of California

1

* * *

2     When **the information** from identification encoder 112 is **digital**, the digital signal is
3     **input** to the digital input receiver 124, where it is converted to a proper voltage.

* * *

4     When **the retrieved information** from identification encoder 112 is **analog**, the
5     information is **input** to an analog-to-digital converter 123 to convert the analog data
      of the retrieved information into a series of digital data bytes.
6

('720 Patent, Col. 6:26-30, 57-59; Col. 7:1-4.)  Therefore, if the "items of audio/video information"

7     limitation is found to be the information retrieved from physical media prior to being acted upon by

8     the conversion means, the structure in the specification which corresponds to the inputting of that

9     information is "identification encoder 112."  The phrase "identification encoder" has been ruled

10    indefinite by the Court.  Therefore, this construction, if adopted by the Court, would lead to a

11    finding that Claim 7 is invalid for lack of corresponding structure for the inputting means.

12         Acacia contends that "analog receiver" 127 and "digital input receiver" 124 are

13    corresponding structure to the "inputting means" if the function is defined as inputting information

14    derived from physical media.  (See Docket Item No. 184 at 62.)  The Court declines to adopt

15    Acacia's contention because in the written description the patentee acting as lexicographer defines

16    these structures as part of the "conversion means:"

17
          The transmission system 100 of the present invention also preferably includes **conversion
18        means 113** for placing the items from source material library 111 into a predetermined
          format as formatted data.  In the preferred embodiment, after identification encoding is
19        performed by identification encoder 112, the retrieved information is placed into
          predetermined format as formatted data by the converter 113.  The items stored in source
20        material library 111 and encoded by identification encoder 112 may be in either analog or
          digital form.  **Converter 113 therefore includes analog input receiver 127 and digital
21        input receiver 124.**

22    ('720 Patent, Col. 6:44-54.)[10]

23    _____

24         [10]  Adopting Acacia's contention would require the Court to identify receivers 127 and 124
      as corresponding structure to both the "inputting means" and the "conversion means."  This could
25    arguably render the "inputting means" superfluous because the "conversion means" would perform
      the inputting function.  A single structural element which contains components which performs two
26    separate functions can be corresponding structure for two separate claims, each reciting one of those
      functions.  In re Kelly, 305 F.2d 909, 911 (C.C.P.A. 1962).  However, the written description clearly
27    define these receiver structures as part of the conversion means and not of the inputting means.

28

United States District Court

For the Northern District of California

1  To qualify as corresponding, a structure must not only perform the claimed function, but the

2  specification must clearly associate the structure with performance of the claimed function.  Cardiac

3  Pacemakers, Inc., 296 F.3d at 1113.  There is nothing in the written description which clearly links

4  these receivers to the inputting means.  Accordingly, under this alternative definition of the inputting

5  function, the Court still finds Claim 7 arguably invalid for lack of corresponding structure.

6  **2.     "conversion means," "compression means," and "transmitter means"**

7  The Court declines to construe the remaining disputed words and phases of the '720 Patent,

8  pending further proceedings with respect to the conclusions reached in this Order.

9  **V.  CONCLUSION**

10  In this Order, the Court has construed some of the disputed words and phrases of the '863

11  and '720 Patents submitted for construction.  The Court invites any party desiring to file motions for

12  reconsideration or for an evidentiary hearing to present extrinsic evidence with respect to those

13  definitions to do so in accordance with the Civil Local Rules of the Court.  There were words and

14  phrases submitted for construction which were not addressed in this and other Orders.  To the extent

15  a party believes that further claim constructions are necessary, the Court invites that party to submit

16  a request to that effect.  The Court will notify the parties of any deadlines for making further

17  motions in a Case Management Order.  Any party wishing to file a motion for summary adjudication

18  based on the Court's constructions is invited to do so in accordance with the Civil Local Rules of the

19  Court.

20

21  Dated: March 2, 2007  _____

22  JAMES WARE
   United States District Judge

28

**United States District Court**
For the Northern District of California

1

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2  Alan P. Block blocka@hbdlawyers.com; Alfredo A. Bismonte abismonte@beckross.com
Annamarie A. Daley aadaley@rkmc.com; Asim M. Bhansali amb@kvn.com

3  Benjamin Hershkowitz bhershkowitz@goodwinprocter.com; Bobby T. Shih bshih@mount.com
Bradford P. Lyerla blyerla@marshallip.com; Daniel Reisner dreisner@kayescholer.com

4  Daniel E. Jackson djackson@kvn.com; Daralyn J. Durie ddurie@kvn.com
David Benyacar dbenyacar@kayescholer.com; David A. York david.york@lw.com

5  David J. Silbert djs@kvn.com; David P. Pearson dpearson@winthrop.com
Emmett J. McMahon ejmcmahon@rkmc.com; Harold J. McElhinny HmcElhinny@mofo.com

6  J. Timothy Nardell EfilingJTN@cpdb.com; James Michael Slominski jslominski@hh.com
Jan J. Klohonatz jklohonatz@tcolaw.com; Jason A. Crotty jcrotty@mofo.com

7  Jeffrey D. Sullivan jeffrey.sullivan@bakerbotts.com; Jeffrey H. Dean jdean@marshallip.com
Jeremy Michael Duggan jduggan@beckross.com; Jon-Thomas Bloch jbloch@marshallip.com

8  Jonathan E. Singer singer@fr.com; Juanita R. Brooks brooks@fr.com
Kevin D. Hogg khogg@marshallip.com; Kevin G. McBride kgmcbride@jonesday.com

9  Kevin I. Shenkman shenkmank@hbdlawyers.com; Maria K. Nelson mknelson@jonesday.com
Marsha Ellen Mullin memullin@jonesday.com; Matthew I. Kreeger mkreeger@mofo.com

10  Michael J. McNamara michael.mcnamara@bakerbotts.com
Mitchell D. Lukin mitch.lukin@bakerbotts.com; Morgan William Tovey mtovey@reedsmith.com

11  Patrick J. Whalen pwhalen@spencerfane.com; Paul A. Friedman pafriedman@mofo.com
Rachel Krevans rkrevans@mofo.com; Richard R. Patch rrp@cpdb.com

12  Roderick G. Dorman dormanr@hbdlawyers.com; Sean David Garrison sgarrison@lrlaw.com
Stephen E. Taylor staylor@tcolaw.com; Stephen P. Safranski spsafranski@rkmc.com

13  Todd Glen Miller miller@fr.com; Todd R. Tucker ttucker@rennerotto.com
Victor de Gyarfas vdegyarfas@foley.com; Victor George Savikas vgsavikas@jonesday.com

14  William J. Robinson wrobinson@foley.com; William R. Overend woverend@reedsmith.com
William R. Woodford woodford@fr.com

15

16  **Dated: March 2, 2007**                          **Richard W. Wieking, Clerk**

17                                                     **By:  /s/ JW Chambers**
                                                       **Elizabeth Garcia**
18                                                     **Courtroom Deputy**

19

20

21

22

23

24

25

26

27

28