RACHEL KREVANS (CA SBN 116421)
MATTHEW I. KREEGER (CA SBN 153793)
JASON A. CROTTY (CA SBN 196036)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
RKrevans@mofo.com
MKreeger@mofo.com
JCrotty@mofo.com

Attorneys for Defendants
ECHOSTAR SATELLITE LLC AND
ECHOSTAR TECHNOLOGIES CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>ACACIA MEDIA TECHNOLOGIES CORPORATION | Case No. 05-CV-1114 JW<br>MDL No. 1665<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION RE EXCEPTIONAL CASE**<br><br>Date: TBD<br>Time: TBD<br>Courtroom: 8, 4th Floor<br>Judge: Hon. James Ware |

# TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................... ii

I.     Introduction ........................................................................................................ 1

II.    Background ......................................................................................................... 1

    A.    Acacia and the Asserted Patents ............................................................ 1

    B.    The Sarnoff Report ................................................................................ 2

    C.    The Central District Litigation .............................................................. 4

    D.    The Cable and Satellite Cases and the MDL Proceedings ..................... 6

    E.    Acacia's Objections to the Technical Advisor ....................................... 9

    F.    Acacia Serially Offers Covenants Not to Sue ..................................... 12

III.   Applicable Law ................................................................................................ 14

IV.   Argument ......................................................................................................... 15

V.    Conclusion ....................................................................................................... 20

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

**CASES**

4

5

*Acacia Media Techs. Corp. v. New Destiny Internet Group, Inc.*,
No. 02-CV-1040 (C.D. Cal. Sept. 23, 2003) ............................................................... 4

6

7

*Ass'n of Mexican-Am. Educators v. California*,
231 F.3d 572 (9th Cir. 2000) .............................................................................. 10, 11

8

*Beckman Instruments, Inc. v. LKB Produkter AB*,
892 F.2d 1547 (Fed. Cir. 1989) ................................................................................ 15

9

10

*Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp.*,
267 F.3d 1370 (Fed. Cir. 2001) ................................................................................ 17

11

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
326 F.3d 1226 (Fed. Cir. 2003) ................................................................................ 17

12

13

*Cambridge Prods., Ltd. v. Penn Nutrients, Inc.*,
962 F.2d 1048 (Fed. Cir. 1992) ................................................................................ 14

14

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) ................................................................................ 14

15

16

*Digital Control, Inc. v. Charles Mach. Works*,
437 F.3d 1309 (Fed. Cir. 2006) ................................................................................ 17

17

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ................................................................................ 17

18

19

*Fed. Trade Comm'n v. Enforma Natural Prods., Inc.*,
362 F.3d 1204 (9th Cir. 2004) ............................................................................ 11, 12

20

*Fiers v. Revel*,
984 F.2d 1164 (Fed. Cir. 1993) .................................................................................. 3

21

22

*Hoffmann-La Roche, Inc. v. Invamed, Inc.*,
213 F.3d 1359 (Fed. Cir. 2000) ................................................................................ 15

23

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) ................................................................................ 15

24

25

*In re Acacia Media Techs. Corp. Patent Litig.*,
360 F. Supp. 2d 1377 (J.P.M.L. 2005) ....................................................................... 7

26

27

28

*In re Acacia Media Techs. Corp. Patent Litig.*,
   Case No. 1665 (J.P.M.L. Nov. 11, 2004) ........................................................... 6

*Larson Mfg. Co. of S. Dakota, Inc. v. Aluminart Prods., Ltd.*,
   559 F.3d 1317 (Fed. Cir. 2009) ........................................................................ 17

*Li Second Family Ltd. v. Toshiba Corp.*,
   231 F.3d 1373 (Fed. Cir. 2000) ........................................................................ 17

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998) ........................................................................ 15

*Nilssen v. Osram Sylvania, Inc.*,
   528 F.3d 1352 (Fed. Cir. 2008) ................................................... 14, 15, 18, 19

*Pharmacia Corp. v. Par Pharm., Inc.*,
   417 F.3d 1369 (Fed. Cir. 2005) ........................................................................ 17

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
   204 F.3d 1368 (Fed. Cir. 2000) ........................................................................ 17

*Sensonics, Inc. v. Aerosonic Corp.*,
   81 F.3d 1566 (Fed. Cir. 1996) .................................................................... 14, 15

*Sun-Tek Indus., Inc. v. Kennedy Sky Lites, Inc.*,
   929 F.2d 676 (Fed. Cir. 1991) ......................................................................... 14

*TechSearch, L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002) ........................................................................ 10

*Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*,
   576 F.3d 1302 (Fed. Cir. 2009) ........................................................................ 15

**STATUTES**

28 U.S.C. § 1407 .................................................................................................... 6

35 U.S.C.
   § 112 ........................................................................................................... 1, 4
   § 285 ........................................................................................... 1, 14, 15, 20

37 C.F.R. § 1.56 .................................................................................................... 4

Fed. R. Civ. P. 54(d)(2) ........................................................................................ 1

Fed. R. Evid. 706 ........................................................................................... 9, 11

**OTHER AUTHORITIES**

Civ. L.R. 54 .................................................................................................... 1, 13

## I.      INTRODUCTION

Pursuant to the Court's order dated October 23, 2009, EchoStar submits this motion for attorneys fees.  *See* Docket No. 356; Fed. R. Civ. P. 54(d)(2); Civ. L.R. 54-6.  Under 35 U.S.C. § 285, the Court may award reasonable attorneys fees to a prevailing party in "exceptional cases."

This case has a long and complex history beginning in 2002, with Acacia's initial lawsuit regarding these patents.  The litigation has included proceedings before the Judicial Panel on Multidistrict Litigation, numerous *Markman* proceedings and motions to reconsider, a series of covenants not to sue by Acacia, Acacia's unfounded objections to the Court's use of a technical advisor, countless changes in Acacia's positions on numerous substantive and procedural issues, and, finally, the Court order granting summary judgment against Acacia on all of the asserted claims.  Acacia's litigation tactics have maximized the cost and duration of this litigation to the Court and the parties, and despite numerous motions by Acacia, the result was a finding that all of the claims were invalid as indefinite.  Acacia's claims were declared invalid *even before the Court considered non-infringement, prior art invalidity, invalidity under 35 U.S.C. § 112, ¶ 1, and unenforceability*.  And even before Acacia filed suit against many of the defendants, the Court had already made a finding that key elements of the claims were invalid as indefinite.  As defendants' motions for summary judgment on written description and enablement demonstrate, the claims are invalid on many other grounds as well.

Acacia has imposed huge costs on virtually the entire cable and satellite television industry and its case did not even progress past claim construction.  In light of these facts, the clear weaknesses of the asserted patents, and Acacia's litigation tactics, this is an "exceptional case" within the meaning of 35 U.S.C. § 285, and EchoStar, as a prevailing party, is entitled to its attorneys fees.

## II.     BACKGROUND

### A.      Acacia and the Asserted Patents

Acacia is "engaged in the business of acquiring, licensing and enforcing patents.  The subsidiaries of Acacia Research buy patents as well as represent patent owners on contingency

basis to generate revenue from licensing and enforcement."[1]  Within Acacia's patent portfolio are the five patents it asserted against the many present and past defendants in this suit:  U.S. Patent Nos. 5,132,992 ('992 patent), 5,253,275 ('275 patent), 5,550,863 ('863 patent), 6,002,720 ('720 patent), and 6,144,702 ('702 patent).  According to Acacia, the patents in suit — which it styles "DMT" — can be characterized as follows:[2]

> This patented technology generally relates to the transmission and receipt of digital audio and/or audio video content via a variety of means including the internet, cable, satellite, and local area networks. Elements of the DMT® transmission process include a source material library, identification encoding process, format conversion, sequence encoding, compressed data storage, and transmission. Elements of the DMT® receiving process include a transceiver, format conversion, storage, decompression, and playback.

Acacia asserts that these patents are extremely broad, covering streaming content over the internet and satellite and cable transmission of television broadcasts.[3]

## B.   The Sarnoff Report

The application that ultimately issued as the '992 patent was filed on January 7, 1991.  On April 20, 1992, the David Sarnoff Research Center provided a "summary technical evaluation" of the "patent document" entitled "Audio and Video Transmission and Receiving System."  *See*

---

[1] *See* Ex. 1 (http://acaciatechnologies.com/).  Unless otherwise noted, all Exhibits referenced herein are attached to the Declaration of Jason A. Crotty in Support of Motion Re Exceptional Case.

[2] *See* Ex. 2 (http://acaciatechnologies.com/patentportfolio.htm#Digi).

[3] The Electronic Frontier Foundation ("EFF") has a "Patent Busting Project" to protect innovation and free expression.  *See* Ex. 3 (http://w2.eff.org/patent/wp.php).  EFF states:  "Every year numerous illegitimate patent applications make their way through the United States patent examination process without adequate review.  The problem is particularly acute in the software and Internet fields where the history of prior inventions (often called "prior art") is widely distributed and poorly documented."  As part of this project, EFF identified a number of what it considered the "worst offenders."  Acacia's '992 patent was included in this list.  *See* Ex. 4 (http://w2.eff.org/patent/wanted/patent.php?p=acacia) ("Laughably broad patent would cover everything from online distribution of home movies to scanned documents and MP3s.").  Although the views of EFF are not binding on courts or the PTO, these views are representative of the patents-in-suit.

Ex. 5.  The report was provided to Lee Browne of Greenwich Technologies (Acacia's predecessor

in the ownership of the patents in suit) pursuant to an agreement dated March 6, 1992.

Mr. Browne is one of the named inventors on the patents in suit.  *See id*.  The "summary" of the

report stated:

> The patent document supplied by Greenwich Technologies outlines
> a generic set of technologies necessary for a video-on-demand
> system.  The general principles of the system described in the
> patent are believed to be technically correct, though significant
> additional design detail will have to be developed before a proof-of-
> concept prototype can be implemented.  Based on our review of
> published material (see references) in the area of video-on-demand,
> interactive multimedia, etc., we do not consider the overall system
> architecture to be novel in a scientific/technological sense.

*Id*. at 2.  In other words, the technical experts hired by the inventors reported that the technology

contained in the document was *not* novel and that significant additional design detail would be

required even before a "proof of concept" could be implemented.  Simply put, the technical

review determined that the patent document did not contain anything new, though it did contain

some ideas for further research.[4]  In fact, the disclosure was far from even a proof of concept.  At

a minimum, the Sarnoff report raises issues regarding anticipation, obviousness, enablement, and

written description.

The Sarnoff report included a list of twenty-eight references that disclosed various aspects

of the system outlined in the application, and it included copies of those references.  Of the

twenty-eight references cited in the Sarnoff report, twenty-two were published before the filing

date of the '992 patent application.  Among the list of references in the Sarnoff Report was an

article identified as "GE 91" by A.D. Gelman, *et al*., titled "A Store-and-Forward Architecture for

Video-On-Demand Service" ("the Gelman article").  According to the Sarnoff report, the Gelman

article discloses various aspects of the video-on-demand system outlined in the '992 patent

---

[4] Of course, the policy behind the patent laws is to "promote disclosure of inventions, not
of research plans."  *Fiers v. Revel*, 984 F.2d 1164, 1169 (Fed. Cir. 1993).

1   application.  The information provided in the Sarnoff report is material, as defined by 37 C.F.R.

2   § 1.56.

3   　　Despite the written concerns of its own technical consultants and the receipt of the report

4   by a named inventor during the prosecution of the '992 patent, the Sarnoff report was *not*

5   disclosed to the United States Patent & Trademark Office (PTO).  Nor were any of the references

6   cited therein disclosed to the PTO during prosecution of the '992 patent.  Indeed, neither the

7   Sarnoff report nor its cited references were disclosed to the PTO until after the filing of a

8   continuation application in 2000, approximately eight years after the date the report was provided

9   to a named inventor.  By that time, all of the patents involved in this lawsuit had issued.  Thus,

10   although the applicants recognized the clear relevance of the report and the cited references, by

11   the time they were finally submitted to the PTO, it was too late for all of the patents in this case.

12   　　**C.　　The Central District Litigation**

13   　　This case began in November 2002, when Acacia filed a number of separate suits in the

14   Central District of California, alleging patent infringement by various internet-based companies

15   (the "Round One" defendants).  By September 2003, Acacia had filed *forty-seven* separate actions,

16   some of which are no longer pending.  *See, e.g.*, Ex. 6 (Acacia's September Monthly Status

17   Report, *Acacia Media Techs. Corp. v. New Destiny Internet Group, Inc.*, No. 02-CV-1040 (C.D.

18   Cal. Sept. 23, 2003)).  Ultimately, at Acacia's request, the pending cases were consolidated for

19   pre-trial purposes.  *See* Ex. 7 (Order, *New Destiny*, No.02-CV-1040 (C.D. Cal. Dec. 18, 2003)).

20   　　After extensive briefing and four days of hearings, the Court issued its (first) *Markman*

21   Order on July 12, 2004, construing terms in the then-asserted claims of the '992 and '702 patents

22   and identifying two terms, "identification encoding means" and "sequence encoder" as "arguably

23   indefinite."  Ex. 8 (Markman Order, *New Destiny*, No. 02-CV-1040 (C.D. Cal. Jul. 12, 2004)

24   (hereinafter "*Markman* I Order")).  In this Order, the Court invited Acacia to move for an

25   evidentiary hearing as to whether one of skill in the art could identify a corresponding structure

26   for "identification encoding means" and invited the defendants to move for summary judgment of

27   invalidity under 35 U.S.C. § 112, ¶¶ 1-2.  *Id.* at 21.  Acacia repeatedly declined to seek an

28   evidentiary hearing, but defendants filed a motion for summary judgment.  *See* Ex. 9 (*New*

1  *Destiny*, No. 02-CV-1040 (C.D. Cal. Sept. 20. 2004)).  This motion was fully briefed by the

2  parties.

3      However, in response to defendants' summary judgment motion, Acacia, without leave of

4  Court or notice to defendants, submitted expert declarations asserting (albeit conclusorily) that the

5  claim terms were not indefinite.  *See, e.g.*, Exs. 10, 11 (Alexander and Weiss Declarations, *New*

6  *Destiny*, No. 02-CV-1040 (C.D. Cal. Oct. 20, 2004)).  Remarkably, Acacia argued that

7  *defendants'* lack of expert testimony on invalidity was fatal to the summary judgment motion.

8  *See, e.g.,* Ex. 12 (Acacia Opp. at 8-9, *New Destiny*, No. 02-CV-1040 (C.D. Cal. Oct. 20, 2004)).

9  Acacia further argued that, in view of its new expert declarations, it would be "reversible error"

10  for the Court not to revisit its *Markman* I Order.  *Id.* at 19-24.  In addition, because Acacia had

11  "withdrawn" claims 1-18 of the '992 patent from the suit after the Court issued its *Markman* I

12  Order, Acacia argued that a judgment of invalidity for indefiniteness of these claims would be an

13  impermissible "advisory opinion."  *Id.* at 17-18.  In response, Defendants argued that Acacia's

14  withdrawal was a brazen attempt to avoid an impending judgment of invalidity as to these claims,

15  that Acacia knew these claims to be invalid after the *Markman* I Order but nonetheless forced

16  defendants to expend the resources to file a summary judgment motion, and that Acacia's sudden

17  and unauthorized submission of expert declarations on claim construction post-*Markman* was an

18  attempt to "thwart the entire process." Ex. 13 (New Destiny Reply at 22, *New Destiny*, No. 02-

19  CV-1040 (C.D. Cal. Nov. 18, 2004)). Accordingly, Defendants sought attorneys fees for Acacia's

20  willful violation of the Court's orders and its vexatious and oppressive conduct with regard to the

21  litigation of claims 1-18 of the '992 patent.  *Id.* at 18-23.

22      In the meantime, Acacia had filed yet more lawsuits.  Because of the pending motion

23  before the MDL panel, discussed below, the Court declined to rule on defendants' motion for

24  summary judgment. Ex. 14 (Order, *New Destiny*, No. 02-CV-1040 (C.D. Cal. Dec. 1, 2004)).

25  Although the "sequence encoder" and "identification encoder"-based arguments for invalidity for

26  indefiniteness and/or lack of enablement, at least as to the '702 patent, were fully in place at this

27  time, Acacia's procedural machinations would mean that final judgment of invalidity of the

28  claims that include the terms "sequence encoder" and "identification encoder" would have to wait

1    almost another five years.  These years have essentially been a waste of time, money, and effort,

2    as they effectively confirmed the ruling handed down in 2004.

3        **D.      The Cable and Satellite Cases and the MDL Proceedings**

4        When the Court consolidated the Round One defendants' cases, the Court directed Acacia

5    to file any further actions on the patents in suit in the Central District of California.  *See* Ex. 7

6    (Order, *New Destiny*, No. 02-CV-1040 (C.D. Cal. Dec. 18, 2003)).[5]  Despite this Order, and

7    without seeking approval from the Court, Acacia filed several new actions in district courts across

8    the country against various satellite and cable companies ("Round Two" defendants), including

9    EchoStar.  *See* N.D. Cal. Case Nos. 04-CV-3789 (filed Sept. 9, 2004), 04-CV-02308 (filed June

10   14, 2004); D. Az. Case No. 04-CV-1891 (filed Sept. 10, 2004); D. Minn. Case No. 04-CV-4069

11   (filed Sept. 10, 2004); N.D. Ohio Case No. 04-CV-1847 (filed Sept. 10, 2004).  The new cases

12   included the '992 and '702 patents that had been asserted in the prior cases, plus several additional

13   related patents.

14       In July 2005, with all these cases pending in various districts, Acacia stated that it did *not*

15   intend to move that the existing cases be consolidated for pretrial proceedings under the

16   multidistrict litigation provisions of 28 U.S.C. § 1407.[6]  Yet four months later, in November 2004,

17   Acacia reversed course and did exactly that.  *See* Ex. 17 (Acacia's Motion to Transfer, *In re*

18   *Acacia Media Techs. Corp. Patent Litig.*, Case No. 1665 (J.P.M.L. Nov. 11, 2004).  On February

19   24, 2005, the Judicial Panel on Multidistrict Litigation ordered the pending Round One and Round

20       [5] *See id*. at ¶ 7 ("Plaintiff shall file any case involving the '992 patent or a patent which is
21   a continuation or divisional of the '992 patent in the Central District of California, Southern
     Division.  Plaintiff shall file a notice of related case with this Court in any action that involves
22   U.S. Patent Nos. '702, '992 or other patents held by Plaintiff filed outside of California.").
     Acacia later attempted to explain that it did not believe the order required it to file all new cases
23   in the Central District.  *See* Ex. 15 (Notice of Filing of Related Case – C04-02308 FMS – in the
     Northern District of California at 1, *New Destiny*, No. 02-1040 (N.D. Cal. June 15, 2004).
24
         [6] *See* Ex. 16 (Notice of Pendency of Other Actions at 2-3, *Comcast*, No. 04-2308 (N.D.
25   Cal. Jul. 22, 2004) ("Pursuant to Local Rule 3-13(3)(B), Acacia does not believe that transfer of
     this case to the Central District should be effected pursuant to 28 U.S.C. § 1407.  Coordination in
26   some form might avoid conflicts, conserve resources, or promote an efficient determination of
     this action.  Plaintiff Acacia has no present intention to file a motion to transfer or to
27   coordinate.").

28

1   Two actions centralized in this Court for coordinated or consolidated pretrial proceedings.  *In re*

2   *Acacia Media Techs. Corp. Patent Litig.*, 360 F. Supp. 2d 1377 (J.P.M.L. 2005).

3          After consolidation in this Court and in response to the Court's invitation to file motions

4   for reconsideration of its *Markman* I ruling, *see* Dkt. 22, the parties (Acacia and the Rounds One

5   and Two defendants) submitted extensive briefing, and the Court held a two-day hearing, on

6   September 8-9, 2005.  On December 7, 2005, the Court issued its second *Markman* order

7   (hereinafter "*Markman* II Order"), which reaffirmed its *Markman* I definitions of seven terms in

8   the '992 and '702 claims, and determined unequivocally that "sequence encoder" and

9   "identification encoder" were indefinite.  Dkt. 119.  By extension, the Court concluded its

10  determination of indefiniteness rendered at least claims 1, 7, 27, and 32 of the '702 patent invalid.

11  *Id.*

12         Meanwhile, Acacia had sued yet more defendants in yet more courts.  *See* S.D.N.Y. Case

13  No. 05-CV-4148 (filed Apr. 16, 2005); E.D.N.Y. Case No. 05-CV-2036 (filed Apr. 26, 2005).  On

14  Acacia's motion, and over opposition from the defendants involved, the MDL panel ultimately

15  transferred the two cases filed in federal district courts in New York to this Court for inclusion in

16  the consolidated pre-trial proceedings.  *See* Transfer Order, *In re Acacia Media Techs. Corp.*

17  *Patent Litig.*, Case No. 1665 (J.P.M.L. Oct. 20, 2005) (filed as Hymas Decl. Ex. E, Dkt. 250-3).

18         This Court ultimately issued four more *Markman* orders, reflecting both the opportunity it

19  afforded the Round Three defendants to revisit the earlier constructions and the number of claims

20  at issue in the by now five patents-in-suit.  Throughout this process, Acacia repeatedly changed its

21  positions, thus adding to the length and complexity of the briefing.  In other words, Acacia

22  utilized the opportunity to participate that the Court provided to the *new parties* that had just been

23  added to the litigation to revamp its own case and serially present the Court its second and third

24  tier arguments.

25         Perhaps the most striking example of this behavior was with respect to the term "sequence

26  encoder," the indefiniteness of which is key to the invalidity rulings.  Although it is not unheard of

27  for parties' claim constructions to evolve over the course of litigation, Acacia's flip-flopping

28  appears to have been designed to evade the Court's *Markman* orders and further add to the cost

and complexity of the case.  During the *Markman* I process, Acacia argued that even though the '702 specification did not use the phrase "sequence encoder," it should be "construed consistent with the scope of the invention disclosed in the '702 patent specification as a 'time encoder, *i.e.*, a device or software which places blocks of converted formatted information into a sequence or group of addressable data blocks by assigning relative time markers to data prior to subsequent compression.'"[7]  Ex. 18 (Acacia's claim construction Br. at 24, *New Destiny*, No. 02-CV-1040 (C.D. Cal. May 7, 2004)).  But because this definition of "sequence encoder" would effectively mean that claims 1 and 7 of the '702 patent had the same scope, Acacia argued in a post-hearing brief that the doctrine of claim differentiation is a "guide" and not a rigid rule of claim construction.  Moreover, because the '702 specification disclosed only a "time encoder," according to Acacia the need for consistency with the specification "takes priority over claim differentiation.  Thus, similarity with claim 7 must be tolerated."  Ex. 19 (Acacia Br. at 28, *New Destiny*, No. 02-CV-1040 (C.D. Cal. Jun. 14, 2004)).  In an about-face, in its *Markman* II Opening Brief, Acacia argued that "[i]f the 'sequence encoder' of claim 7 is understood to be a time encoder with the additional function of transforming digital data blocks into a group of addressable data blocks, as indicated by the Court in its *Markman* Order, then, pursuant to the doctrine of claim differentiation, the sequence encoder of claim 1 must be broader, *i.e.*, a time encoder that is not limited to this function."  Dkt. 59 at 19.  To this end, Acacia sought *separate* definitions for "sequence encoder" in '702 claims 1, 17, 18, and 32 ("a time encoder") than in claims 7 and 33 ("a time encoder that transforms digital data blocks into a group of addressable data blocks").  *Id.* at 20.  But at the *Markman* II hearing, Acacia switched positions yet again and abandoned this "group"-based distinction between claims 1 and 7 after admissions by Acacia's expert Mr. Weiss on cross-examination.  *See* Dkt. 102 at 2 (citing Markman hearing Tr. at 233).

---

[7] Of course, EchoStar disagrees with Acacia on this point — "sequence encoder" is a term that lacks meaning in the art and is not used in the specification.  Acacia's position that "sequence encoder" is a "time encoder" is unsupportable.  *See, e.g.,* Dkt. 77 at 6-7; Dkt. 102 at 2-6.  The Court's repeated conclusions that "sequence encoder" is indefinite are correct.

1    Acacia's claim construction flip-flops were not confined to "sequence encoder."  As

2    explained in Round One and Two Defendants' Supplemental Claim Construction Brief on the

3    '992 and '275 Patents (Dkt. 191), Acacia changed its position on "receiving system" a number of

4    times, first arguing that "receiving system" meant the same thing in the '992 and '275 patents,

5    then arguing that they had different meanings; first asserting that the related term "reception

6    system" in claims 2 and 5 of the '275 patent did *not* need to be located a the head end of the cable

7    television system, then at the *Markman* hearing, stipulating that it did.  *See* Dkt. 191 at 2-3 (setting

8    out changes).  And Acacia proposed no fewer than *four* significantly different constructions for

9    the term "storing," which is used in claims 1 and 41 of the '992 patent.  *See* Dkt. 249 at 1-6

10   (setting out changes).

11       **E.       Acacia's Objections to the Technical Advisor**

12       Because of the complexity of the case, the Court appointed a technical advisor to assist the

13   Court on technical matters.  Mr. Schulz was initially appointed in the litigation in the Central

14   District of California on April 7, 2004.  *See* Ex. 20 (Order, *New Destiny*, No. 02-CV-1040 (C.D.

15   Cal. Apr. 7, 2004)).  All of the parties to those cases — including Acacia — *stipulated* to the

16   terms of the appointment.  *See* Dkt. 21.  As the Court later noted in a June 21, 2005 Order, the

17   parties and the Court all understood that Mr. Schulz would be a confidential advisor to the Court.

18   *See* Dkt. 21.  On July 12, 2004, the Court issued its *Markman* I Order in those cases.  *See* Ex. 8

19   (Markman Order, *New Destiny*, 02-CV-1040 (C.D. Cal. Jul. 12, 2004)).  That order did not adopt

20   all of the constructions proposed by Acacia.  *Id.*  Only after the Court declined to adopt all of its

21   proposed constructions did Acacia supposedly realize that the order appointing the technical

22   advisor to which Acacia had previously stipulated was "ambiguous" and needed "clarification."

23       Acacia's objection to the propriety of Mr. Schulz's appointment was filed on February 18,

24   2005, more than nine months after the initial appointment.  *See* Ex. 21 (Acacia Br., *New Destiny*,

25   No. 02-CV-1040 (C.D. Cal. Feb. 18, 2005)).  Acacia argued that a reference in the order to

26   Federal Rule of Evidence 706 required that Mr. Schulz be deposed and that his previously agreed-

27   upon role be "clarif[ied]."  *Id.*  Acacia asserted that Mr. Schulz must have provided "evidence"

28   beyond his proper role as a technical consultant because certain constructions adopted by the

1  Court had not been proposed by the parties in exactly the language adopted by the Court — an

2  astounding suggestion that the Court was not capable of independent reasoning.  Acacia also

3  contended that Mr. Shultz's invoices indicated that Mr. Schulz provided "evidence" to the Court.

4  *See id.* at 1-2.  In other words, Acacia argued that the Court had inappropriately used the technical

5  advisor.  The motion was fully briefed but was continued pending Acacia's MDL motion.  During

6  the pendency of the motion, the Court suspended its consultation with Mr. Schulz.

7      After the MDL proceedings were complete, the Court proposed procedural protections

8  consistent with Ninth Circuit law and invited the parties to object to the proposed appointment,

9  with such objections to be addressed to the assigned Magistrate Judge for findings and

10  recommendations.  *See* Dkt. 21.  Of course, technical advisors are entirely unremarkable in

11  complex patent litigation.[8]  The only party to object to the proposed appointment was Acacia,

12  which stated that it believed the Court had improperly used the technical advisor.  *See* Dkts. 28,

13  48.[9]  Acacia stated that the order of appointment "appears to have been made to prevent Mr.

14  Schulz from ever being deposed," as if that were unusual or improper.  Dkt. 28 at 1.  Acacia

15  insultingly speculated that because the Court adopted constructions that were not identical to those

16  proposed by a party, the Court must have improperly used the technical advisor.  *See id.* at 11

17

18      [8] *See, e.g.*, *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1377 (Fed. Cir. 2002)
   (internal citations omitted):

19

20          A technical advisor is helpful in assisting the court in understanding
            the scientific and technical evidence it must consider.  Such evidence

21          in a patent case includes expert testimony, scientific articles and texts,
            and patents, upon which the court must rely in understanding the

22          technology so that it can interpret the patent claims and determine
            whether to grant motions for summary judgment of validity, invalidity,

23          infringement or noninfringement, and to assist the court in articulating
            appropriate jury instructions.  In this case, the court specifically noted

24          that evaluation of the prior art required it to consider and understand
            complex technical concepts beyond normal technical and scientific

25          facts regularly addressed by the district court.

26      [9] Notably, in the absence of evidence to the contrary, the Ninth Circuit assumes that
   district courts properly use technical consultants.  *See Ass'n of Mexican-Am. Educators v.*

27  *California*, 231 F.3d 572, 591 (9th Cir. 2000).

28

1   ("There is little doubt that Mr. Schulz has already provided opinion evidence to the Court in this

2   case.").  Acacia thus requested that the order of appointment be rewritten under Federal Rule of

3   Evidence 706, apparently so Acacia could police the Court's compliance with Acacia's view of

4   the law.

5        However, the Court's order of appointment, as well as its prior use of the technical

6   advisor, was fully consistent with Ninth Circuit law.  *See* Dkts. 38, 40.  The order of appointment

7   contained all of the procedural protections that had been suggested in Ninth Circuit case law.  *See*

8   *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 590 (9th Cir. 2000) (*en banc*); *Fed.*

9   *Trade Comm'n v. Enforma Natural Prods., Inc.*, 362 F.3d 1204 (9th Cir. 2004).  Acacia's

10  objections did not address the actual requirements of Ninth Circuit law.  *See* Dkt. 40 at 7-9.

11  Indeed, the processes employed by the Court in this case exemplify the procedural safeguards that

12  ensure the parties have an opportunity to participate in the appointment of the advisor and define

13  the role of the technical advisor before any substantive activity in the case.  *See id.* at 6-9.[10]

14       During prosecution of the patents in suit, Acacia elected to pursue claims containing terms

15  that had no meaning to those of skill in the art and were not used in the specification, a strategy

16  that plainly risked indefiniteness.  When the Court first concluded, albeit tentatively, that the

17  claims were indefinite, Acacia did not stop to reflect on the wisdom of obtaining and later

18  asserting in litigation claims containing terms with no specific meaning or tie to the specification.

19  Rather, it asserted that the Court had misused its technical advisor and proceeded to file two sets

20  of papers on the issue, requiring defendants to brief more unnecessary issues.  For all of the briefs

21

22

---

23       [10] Although the Ninth Circuit has not required strict adherence to any specific procedures
    regarding technical advisors, it has endorsed procedural safeguards initially set forth in dissent by
24  Judge Tashima in *AMAE*.  Those recommendations include:  "(1) utilize a fair and open
    procedure for appointing a neutral technical advisor; (2) address any allegations of bias, partiality,
25  or lack of qualification; (3) clearly define and limit the technical advisor's duties; (4) make clear
    to the technical advisor that any advice he or she gives to the court cannot be based on any extra-
26  record information; and (5) make explicit, either through an expert's report or a record of *ex parte*
    communications, the nature and content of the technical advisor's advice."  *FTC*, 362 F.3d at
27  1215 (quoting *AMAE*, 231 F.3d at 611-14 (Tashima, J., dissenting)).

28

1  and arguments expended on this peripheral issue, the result was entirely predictable:  the

2  Magistrate Judge entered the order or appointment without major modification.[11]

3  ### F.    Acacia Serially Offers Covenants Not to Sue

4          Meanwhile, Acacia's case was crumbling, prompting it to offer covenants not to sue on

5  numerous claims.  Acacia originally asserted 89 claims against the various defendants: claims 1-

6  24, 41-49, and 51-53 of the '992 patent; claims 14-19 of the '863 patent; claims 1-42 of the '702

7  patent; claims 4, 6-8, 11 of the '720 patent, and claims 2 and 5 of the '275 patent.  Dkt. 350 at 2.

8  Acacia voluntarily withdrew claims 1-18 of the '992 patent on August 6, 2004; and on December

9  19, 2007, pursuant to stipulation of the parties, Acacia withdrew claims 23-24, 47-49, and 51-53

10 of the '992 patent.  *Id.* at 3 n.7.  On June 13, 2008, Acacia provided defendants with a covenant

11 not to sue on claims 19-24, 42-44, 47-49, and 51-53 of the '992 patent, claims 2 and 5 of the '275

12 patent, claims 14-16 of the '863 patent, and claims 4 and 6-8 of the '720 patent.  *See* Dkt. 352 at

13 1-2.  Thus, by the time the Court issued its Summary Judgment Order on September 25, 2009, the

14 only remaining asserted claims were claims 41, 45, and 46 of the '992 patent, claims 17-19 of the

15 '863 patent, claim 11 of the '720 patent, and claims 1-42 of the '702 patent.  *See id*. at 2.

16         While fewer asserted claims is a good thing, Acacia's piecemeal approach to dropping

17 claims appears to have been designed solely to prolong unwinnable fights as long as possible, and

18 to avoid adverse judgments on claims the Court had already determined to be indefinite.  Acacia's

19 claim-dropping strategy was part of its attempt to block the Court's consideration of defendants'

20 invalidity arguments, and to cherry-pick issues for appeal.  Indeed, after *Markman* I, Acacia

21 withdrew claims 1-18 of the '992 patent from consideration and on that basis asserted that this

22 divested the Court of jurisdiction to decide issues of invalidity and infringement for these claims.

23 *See* Ex. 12 (Acacia Br. at 17-18, *New Destiny*, No. 02-CV-1040 (C.D. Cal. Oct. 20, 2004)).  But

24

25         [11] Since Acacia's objections accused the Court of improper behavior, the Court evidently
decided that the issue should be resolved by the assigned Magistrate Judge.  The Court also stated
that it would not be informed of the identity of any party that objected.  *See* Dkt. 21 at 4.  As the
26 issue was resolved by the Magistrate Judge long ago and the case is now on appeal to the Federal
Circuit, EchoStar believes these facts may properly be taken account now by the Court for the
27 limited purpose of determining whether the case is exceptional.

28

1   as explained in the Round One defendants' reply brief in support of their summary judgment

2   motion, Acacia's decision to drop these claims *after* the Court issued its *Markman* I order

3   preliminarily finding the term "identification encoding means" indefinite was an act of

4   gamesmanship, and along with other of Acacia's actions, should have entitled the Round One

5   defendants to fees *at that time*, *i.e.,* in late 2004.  *See* Ex. 13 (New Destiny Reply Br. at 17-18,

6   *New Destiny*, No. 02-CV-1040 (C.D. Cal. (Nov. 18, 2004) (citing *Markman* I Order).  Of course,

7   thanks to Acacia's multiplicity of filings, the Round One Defendants' motion for summary

8   judgment was never adjudicated in light of the MDL proceedings.  This would be the first of

9   several instances of claim-dropping by Acacia long after the claims were not viable, but not soon

10   enough to save defendants and, in some cases the Court, from additional time-consuming work.

11   As a testament to the weakness of Acacia's claims and its costly litigation strategy, on

12   January 20, 2006, Acacia moved for summary judgment against itself, and simultaneously sought

13   a Rule 54(b) certification to allow immediate appeal of certain limited issues to the Federal

14   Circuit, even though the MDL process was not yet complete at that time.  *See* Dkt. 120.  A Rule

15   54(b) certification would have undoubtedly further multiplied the litigation, given the overlapping

16   issues and close relationship of the asserted patents.  *See* Dkt. 126.  The Court denied Acacia's

17   motion, noting it was made prior to the completion of claim construction.  *See* Dkt. 259.

18   Acacia made a second attempt in a motion filed June 17, 2008, again seeking summary

19   judgment against itself on limited grounds, insisting that the Court not consider any additional

20   issues.  Dkt. 287.  Even though the parties had agreed to a briefing schedule setting a due-date for

21   summary judgment motions of July 11, 2008, *see* Dkt. 304 at 3, Acacia filed the motion against

22   itself in advance of this date, on June 17, 2008, and attempted without leave of court to set its own

23   motion for a hearing date of July 7, 2008, which would have provided less than the amount of

24   notice specified by the local rules.  Dkt. 287.  Acacia's improper filing was for the purpose of

25   securing a hearing date prior to the date on which defendants' motions would be filed, in yet

26   another attempt to preclude the Court from considering defendants' arguments.  *See* Dkt. 304 at 3.

27   The Court *sua sponte* rejected Acacia's attempt to short-circuit the briefing schedule set out by the

28

1  local rules, and ordered hearings on all summary judgment motions for October 29, 2008.  Dkt.

2  312 at 4 (Oct. 9, 2008).[12]

3  **III.    APPLICABLE LAW**

4        35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable

5  attorney fees to the prevailing party."  *See generally Nilssen v. Osram Sylvania, Inc.*, 528 F.3d

6  1352, 1357 (Fed. Cir. 2008).  This provision is an exception to the so-called "American Rule":

> Under the American Rule each party bears its own attorney fees and
> expenses.  As an exception to that rule, courts have exercised their
> inherent equitable power to make whole a party injured by an
> egregious abuse of the judicial process. . . . Congress enacted
> Section 285 to codify in patent cases the "bad faith" equitable
> exception to the American Rule. . . . Recognizing the good
> faith/bad faith distinction, Congress expressly limited such awards
> to "exceptional cases."

12  *Sun-Tek Indus., Inc. v. Kennedy Sky Lites, Inc.*, 929 F.2d 676, 678 (Fed. Cir. 1991) (internal

13  quotation and citations omitted).  "The determination of whether a case is exceptional and, thus,

14  eligible for an award of attorney fees under § 285 is a two-step process.  First, the district court

15  must determine whether a case is exceptional, a factual determination reviewed for clear error.

16  After determining that a case is exceptional, the district court must determine whether attorney

17  fees are appropriate, a determination [which is reviewed] for an abuse of discretion."  *Cybor Corp.*

18  *v. FAS Techs., Inc.,* 138 F.3d 1448, 1460 (Fed. Cir. 1998) (*en banc*) (citations omitted).  "[T]he

19  exceptional nature of the case must be established by clear and convincing evidence."  *Cambridge*

20  *Prods., Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992).  While an award of

21  fees is discretionary, "[i]t is the judicial duty to refuse to condone behavior that exceeds

22  reasonable litigation tactics."  *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir.

23  1996) (remanding for findings of fact regarding exceptionality).

24

25

26        [12] Defendants explained that Acacia's limited summary judgment motion would not have
   presented the Federal Circuit with the complete invalidity consequences of the Court's claim
27  construction rulings, and that addressing only some of those consequences on appeal could
   ultimately prolong, rather than shorten, this litigation.

28

Findings of "exceptional case" have been based on a variety of factors: "Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit."  *Hoffmann-La Roche, Inc. v. Invamed, Inc.*, 213 F.3d 1359, 1365 (Fed. Cir. 2000) (quoting *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989)); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1481-82 (Fed. Cir. 1998) ("Findings of exceptional case have been based on a variety of factors; for example, willful or intentional infringement, inequitable conduct before the Patent and Trademark Office, vexatious or unjustified litigation, or other misfeasant behavior."); *see generally Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304-06 (Fed. Cir. 2009) (collecting cases).

A final determination of inequitable conduct is not prerequisite to an award of fees under § 285 to a prevailing alleged infringer, but is simply one basis for doing so: "Attorney fees may be warranted for litigation misconduct *or* if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless."  *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1379 (Fed. Cir. 2009) (emphasis added, quotation omitted); *see also Sensonics*, 81 F.3d at 1574 ("Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285.").  A "multiplicity" of acts can support a finding of exceptionality, even where the same conclusion might not be reached if the bad acts were considered individually.  *Nilssen*, 528 F.3d at 1359; *see also Beckman*, 892 F.2d at 1552-53 (affirming award of fees "based on a *strategy* of vexatious activity" and remanding for award of "the portion of its attorney fees which related to the vexatious litigation strategy and other misconduct") (emphasis in original).

## IV.   ARGUMENT

The unnecessarily long and protracted litigation, Acacia's misuse of the judicial process, and the decisive ruling in favor of defendants even before conclusion of the claim construction process, demonstrate that this is an "exceptional case."  Acacia's combination of repeated position-shifting as to claim construction, strategic claim-dropping to avoid entry of judgment,

1   and manipulation of the summary judgment process have abused the process in a manner

2   equivalent to circumstances the Federal Circuit has determined to constitute an "exceptional

3   case." Taken as a whole, the years of expensive litigation that Acacia has imposed on defendants

4   indicate that Acacia's assertion of these patents and its litigation strategy was not in good faith.

5   　　　　Although the Court had already indicated that numerous claims were likely invalid as

6   indefinite, Acacia disregarded the Court's order regarding the filing of new cases in the Central

7   District of California and sued two entire industries, naming as defendants virtually all of the

8   nation's cable and satellite television providers. Even putting aside the considerable problems

9   with the patents on the prior art and inequitable conduct side, Acacia's expansion of this case

10  occurred *after* the Court indicated that many of the claims were indefinite. The *Markman* I Order

11  issued on July 12, 2004. Most of the Round Two cases were not filed until September 2004

12  (except for N.D. Cal. 04-CV-02308, filed June 14, 2004, well after the *Markman* I briefing and

13  hearings) and the Round Three cases were not filed until April 2005. By the time Acacia filed the

14  Round Two and Round Three actions, its case was already collapsing. In filing these additional

15  cases in stages, Acacia successfully delayed the inevitable, at great expense to all the defendants.

16  　　　　Moreover, Acacia's tactics were not limited to imposing huge costs on the Court and the

17  parties. When Acacia received adverse claim construction rulings, its reaction was to blame the

18  Court's allegedly improper use of the technical advisor. Although there was never a shred of

19  evidence that the Court used the advisor improperly, Acacia ignored its own acquiescence to both

20  the advisor and the terms of his appointment, and accused the Court of improper behavior. As

21  described above, the Court's appointment and use of Mr. Schulz were indisputably proper under

22  Ninth Circuit law, and Acacia had no legitimate basis for its accusations.

23  　　　　The failure to disclose the Sarnoff report and the references cited therein presents a strong

24  case of inequitable conduct. Under the duty of candor and good faith owed by all patent

25  applicants and their attorneys to the PTO, the Sarnoff report and the references cited therein

26  constituted highly material information that should have been disclosed during prosecution.

27  Given the high degree of materiality and the fact that the applicants *requested* the Sarnoff report

28  but then failed to disclose its adverse results or the additional prior art references cited therein,

ECHOSTAR'S MOTION RE FEES
CASE NO. 05-CV-1114 JW
sf-2783069

16

1    intent to deceive can be inferred.  Material information includes, but is not limited to, that which

2    "a reasonable examiner would have considered such prior art important in deciding whether to

3    allow the parent application." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1314

4    (Fed. Cir. 2006) (citation omitted).  Importantly, "[i]nformation concealed from the PTO may be

5    material *even though it would not invalidate the patent*." *Larson Mfg. Co. v. Aluminart Prods.,*

6    *Ltd.*, 559 F.3d 1317, 1327 (Fed. Cir. 2009) (quoting *Li Second Family Ltd. v. Toshiba Corp.*, 231

7    F.3d 1373, 1380 (Fed. Cir. 2000)) (emphasis added).  The withholding of material information

8    "with an intent to deceive or mislead the PTO[] constitutes inequitable conduct," and when proven

9    by clear and convincing evidence "renders the patent unenforceable." *Bristol-Myers Squibb Co. v.*

10   *Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1233-34 (Fed. Cir. 2003).  No direct evidence is

11   required to prove intent, which "may be inferred when a patent applicant knew, or should have

12   known, that withheld information could be material to the PTO's consideration of the patent

13   application." *Id.* at 1239 (citing *Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370,

14   1375-76 (Fed. Cir. 2001)).  This is a sliding scale:  the higher the materiality, the lower the level

15   of intent necessary to establish inequitable conduct.  *See Pharmacia Corp. v. Par Pharm., Inc.*,

16   417 F.3d 1369, 1373 (Fed. Cir. 2005).  Indeed, "[p]roof of high materiality and that the applicant

17   knew or should have known of that materiality makes it difficult to show good faith to overcome

18   an inference of intent to mislead." *Id.* (quoting *Semiconductor Energy Lab. Co. v. Samsung Elecs.*

19   *Co.*, 204 F.3d 1368, 1375 (Fed. Cir. 2000)); *accord Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337,

20   1346 (Fed. Cir. 2007) ("relatively weak" evidence of intent may be paired with "strong"

21   materiality to find inequitable conduct).

22          Although perhaps not itself prior art, the Sarnoff reference raised serious questions about

23   the viability of the parent application for all the patents in suit, which a reasonable examiner

24   would have wanted to consider with respect to at least enablement and written description.

25   *Accord Bristol-Myers Squibb*, 326 F.3d at 1234-35 (non-prior art article by inventors raising

26   doubts about efficacy of certain chemical processes within the scope of the claimed invention

27   would have been important to a reasonable examiner's consideration of enablement and was thus

28   material).  Plus, the many references cited by the Sarnoff report, especially the Gelman article,

1   were prior art that would have been important to the examiner and may have been sufficient,

2   whether alone or in combination, to invalidate the claims.

3        As to intent, the applicants indisputably knew about the Sarnoff report and the references it

4   cited.  It was highly material to validity, both as to prior art and enablement.  It would be "difficult

5   to show good faith to overcome an inference of intent to mislead" in these circumstances.

6        While this Court has not yet had the opportunity to rule on inequitable conduct, the Court

7   should consider these facts, as it would discovery misconduct or other bad acts, in weighing the

8   present motion as they contribute to Acacia's conduct in pursuing this litigation.  Taken as a

9   whole, these issues strongly suggest that Acacia filed this suit against the cable and satellite

10  defendants with patents that the Court had *already* determined to be vulnerable, in an effort to

11  leverage the costs of litigation and discovery into lucrative settlements.[13]  Because the Round Two

12  and Three defendants are comparatively larger (by size, sales, type of accused products, etc.) than

13  the Round One defendants, Acacia had little to lose but potentially much to gain from suing the

14  additional defendants.

15       Acacia's tactics justify an award of fees under the Federal Circuit's case law.  In *Nilssen*,

16  the Federal Circuit affirmed a district court's finding that the patentee's inequitable conduct, the

17  frivolity of the lawsuit, and the patentee's litigation misconduct justified an award of fees.  *See*

18  528 F.3d at 1356, 1361.  On appeal, the patentee urged the court to consider its withdrawal of

19  patents near trial, its late production of documents, its intransigence in deposition scheduling, and

20  its disavowal of interrogatory responses "as either harmless oversight of legal formalities or

21  permissibly rough litigation tactics."  *Id.* at 1358-59.  The court refused to accept these

22  justifications: "The dissent picks through the various flaws in the conduct of the patentee to argue

23  that they do not individually justify the exceptional label placed on the case by the district court

24  judge.  *Their multiplicity, however, indicates in part why the district judge ruled as he did.*"  *Id.* at

25  1359 (emphasis added).  The court likewise rejected the patentee's argument that its inequitable

26  ─────────────────────────
27  [13] Acacia has moved to commence expensive and time-consuming discovery, though each time the Court has appropriately determined that the claim construction process and the associated narrowing of the case, should be completed first.  *See, e.g.,* Dkt. 139 at 3-5.

28

conduct was "benign." *Id.* at 1358. Of course, the present case never even made it to discovery, much less to trial, because of the weakness of Acacia's claims. But as in *Nilssen*, the "multiplicity" of Acacia's actions that dramatically increased the cost and length of this litigation, namely its filings against additional defendants *despite* the Court's adverse *Markman* I constructions casting extreme doubt on the viability of Acacia's claims, its ever-shifting positions on claim construction, its non-compliance with Court orders, and its baseless objections to the technical advisor, similarly are beyond the pale of "permissibly rough litigation tactics." And while there has been no hearing on inequitable conduct, Acacia's assertion of claims in spite of its nondisclosure of the Sarnoff report and the references cited therein to the PTO, likewise supports the frivolity and needless waste of this litigation, further justifying a fees award.

The present case is in many ways an invalidity/claim construction version of *E-Pass Techs., Inc. v. 3com Corp.*, in which Judge Jensen awarded fees to various defendants after six years of litigation culminating in summary judgment of non-infringement. No. C-00-2255-DLJ, 2006 U.S. Dist. LEXIS 98257 (N.D. Cal. Nov. 21, 2006), *aff'd without opinion*, 316 Fed. Appx. 994 (Fed. Cir. 2009):

> Reviewing the entire history of the litigation, it is clear to this Court that E-Pass's strategy was to delay and obfuscate in an attempt to keep the case alive as long as possible and to stave off summary judgment. The Court need not cite to each example where E-Pass altered its theory of the case about whether a particular defendant had engaged in direct, contributory or induced infringement; or added or subtracted a particular device in issue; or requested discovery and then never took it and then represented that they never needed it, but based on its knowledge of the discovery history of these cases the Court finds that E-Pass engaged in a strategy of unwarranted delay and obstructive conduct.

*Id.* at *50-*51. As in *E-Pass*, Acacia has taken a "shifting sands" approach to its theories on the case, radically changing its claim constructions and serially dropping claims to avoid judgment when the going got tough, declining to submit expert testimony but then doing so with no notice to defendants or leave of the Court and faulting defendants for not having done so, blaming the Court's appointment of Mr. Schulz for adverse claim constructions, and all the rest. Like the

1    plaintiff in *E-Pass*, Acacia has "engaged in a strategy of unwarranted delay and obstructive

2    conduct," justifying an award of fees.

3    **V.    CONCLUSION**

4          For all of these reasons, this case is "exceptional" within the meaning of 35 U.S.C. § 285

5    and the Court should exercise its discretion to award EchoStar its reasonable attorneys fees and

6    costs.  EchoStar therefore requests that the Court determine this case is "exceptional," that

7    EchoStar is entitled to its fees and that an appropriate award of fees is $3,005,738.83, as set forth

8    in the declaration of Matthew I. Kreeger.  *See* Declaration of Matthew I. Kreeger in Support of

9    EchoStar's Motion re Exceptional Case, submitted herewith.  EchoStar will make the invoices

10   sent to EchoStar available to the Court for an in camera review, if the Court so requests.

11         Respectfully submitted,

12   Dated: January 4, 2010              MORRISON & FOERSTER LLP

13                                By:    /s/ *Rachel Krevans*
                                         Rachel Krevans
14
15                                       Rachel Krevans
                                         Matthew I. Kreeger
16                                       Jason A. Crotty

17                                       Attorneys for Defendants
                                         ECHOSTAR SATELLITE LLC and
18                                       ECHOSTAR TECHNOLOGIES CORP.

19

20

21

22

23

24

25

26

27

28